**AETNA CASUALTY AND SURETY CO.,**
Garnishor, Appellant,

v.

**WALTER OGUS, INC., et al., Appellee.**
**Nos. 20858, 20859.**

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 8, 1967.

Judgment Nov. 22, 1967.

On Petition for Rehearing by the Division or En Banc Feb. 27, 1968.

Messrs. John F. Mahoney, Jr., and Charles E. Pledger, Jr., Washington, D. C., were on the petition for rehearing.

Mr. Frank J. Martell, Washington, D. C., was on the opposition.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

## JUDGMENT

PER CURIAM.

These causes came on to be heard on the record on appeals from the United States District Court for the District of Columbia, and were argued by counsel.

The question in these cases being primarily determined by the peculiar facts and the judgments being supported by findings of fact that are not clearly erroneous, it is

Ordered and adjudged by this Court that the judgments of the District Court appealed from in these causes, are affirmed.

LEVENTHAL, Circuit Judge:

Our judgment of affirmance dated November 22, 1967, recites that the questions in these cases are "primarily determined by the peculiar facts" and the judgments are supported by findings of fact that are not clearly erroneous. Appellants filed a petition for rehearing by the division or en banc asserting that the evidence does not support the court's findings or conclusions of law, and that the case involves a substantial question of first impression relating to the duty owed by an insurance broker to the insured. We have given the case reconsideration, and conclude that the petition for rehearing should be denied. We state our reasons at some length in Part I of this opinion to underscore general reflections in Part II on petitions for rehearing.

I

The matter may be simply put. Lesmark, Inc., was the general contractor on work done for the Charrons at their Eye Street location, and became liable when its excavations, dug by hand under the party walls of the Charrons' neighbors, failed to provide support for the party walls,—acts that were held in an earlier litigation, between the neighbors and Lesmark, to be in violation of the plans and specifications and applicable District of Columbia building regulations, and to constitute negligence that was the proximate cause of damages sustained by the neighbors.[1]

Appellant Aetna Casualty & Surety Co. ("Aetna"), subrogated to moneys due to Lesmark, if any (by virtue of its policy insuring the Charrons, and subsequent garnishment) claims Lesmark was entitled to recover on a third party complaint filed in 1959 against appellee,

Harris and Ogus, Inc. ("Ogus"), general agent of appellee Hartford Accident and Indemnity Co. ("Hartford").

■ Appellees Ogus and Hartford concede that Lesmark had some property damage liability coverage but deny that this included relevant excavation coverage. For some years contractor Michael Abrams, who came to do business under the Lesmark name, was covered by Hartford's Policy 42 MCS 601753. The print of that policy contained certain property damage liability coverage, but Abrams specifically requested that Lesmark not have any coverage whatever as to property. In February 1959, however, to satisfy insurance specifications on a job for Pepco, he requested Ogus to add $100,000 of general property damage coverage; and Ogus, after communication with Hartford, advised Lesmark that this had been done. However, Ogus and Hartford say, and we think rightly, that Hartford's liability did not extend beyond the property damage provision Hartford offered in the outstanding policy, and these plainly excluded liability for damage to abutting walls by reason of excavation.[2]

■ Appellant says Ogus became liable to Lesmark for failure to provide excavation coverage. The trial court found:

16. Harris & Ogus, Inc. did not know, nor did any officer, agent or employee of Harris & Ogus, Inc., that Michael Abrams or Lesmark, Inc. was engaged in making excavations, and specifically, they did not know that either Michael Abrams or Lesmark, Inc. contemplated doing excavation work upon the premises at 1919 Eye Street, N. W., Washington, D. C., owned by Walter S. and Marie L. Charron.

---

1. Judge Tamm's finding of negligence was approved on appeal. Lesmark, Inc. v. Pryce, 118 U.S.App.D.C. 194, 195–196, 334 F.2d 942, 943–944 (1964).

2. "This policy does not apply: * * * (1) * * * to injury to or destruction of any property arising out of * * * (2) the collapse of or structural injury to any building or structure due (a) to excavation, including borrowing, filling or back-filling in connection therewith, or to tunneling, pile driving, coffer-dam work or caisson work, or (b) to moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof; * * *." (J.A. 109).

Appellant says that the evidence does not support finding 16. This contention is absurd. The Ogus officer flatly testified: "I was not aware of the fact that he did excavation. \* \* \* He never told us that he was doing any excavation." (J.A. 199).

Abrams said that he consulted Ogus on his insurance needs, that either he spoke to them on the phone, or they would read the specifications, and that one or the other had happened on the Eye Street job. On direct, *i. e.*, on questioning by attorney for third-party plaintiff, he testified (J.A. 218):

Q. Now, during these several jobs you mentioned between February 1959 and the I Street job, did you engage in any excavation work?

A. All jobs had some means of excavation, some form.

Although this may have been intended to convey such a flavor, it is plain that nowhere does Abrams testify he told Ogus that he (or Lesmark) was engaged in excavation.

We pause to note that the trial judge remarked in colloquy—after saying he found no evidence that Abrams, either expressly or by implication, had expected Ogus to take out excavation insurance, or to insure him fully—as follows (J.A. 285):

As a matter of fact, Mr. Abrams' testimony was such that I don't think I would believe any of it, and therefore, I think I would find that there was never any such request.

Abrams' general observation that all jobs necessarily involve excavation is also without force because on cross examination the import of this generalization was undercut by Abrams' admission that he ordinarily hired subcontractors to excavate. And he went on to admit that he usually expected and required them to carry appropriate insurance! (J.A. 245–246)

Appellant may attempt to draw support from a passage wherein Abrams remarked: "We did our own footing work. We never gave out footing work to any-body." (J.A. 221). But the issue so far as Ogus is concerned is Abrams' disclosures to Ogus and the knowledge with which Ogus can reasonably be charged.

At oral argument, for the first time in this case, appellant focused on a single line of a six page Hartford audit indicating that part of Lesmark's premiums went to cover liability for damages resulting from excavation. (J.A. 162). From this it is argued that Lesmark was either in fact covered by the policy or Ogus customarily provided such coverage. The fact that an excavation item was picked up on the insurer's audit does not negative lack of knowledge on the part of Ogus.

Assuming its evidentiary relevance, however, the audit item was not brought out meaningfully at the trial. It was buried in an exhibit that was not identified in this way. The point now raised on argument was answered on argument by appellee's counsel with this explanation: Although the exclusion in the policy exempted the carrier where the damages resulted from failure of lateral support due to excavation, the exemption clause did not exculpate from liability in case of other forms of excavation damage (*e. g.*, broken water or gas lines). In view of the explanation and the tardy assertion outlined above, we do not conclude that the finding of the District Court is clearly erroneous.

There can be no doubt that an insurance agent may have affirmative duties to his clients. *E. g.*, Hardt v. Brink, 192 F.Supp. 879 (W.D.Wash.1961). *See* generally Annot., 29 A.L.R.2d 171 (1953).

■ We have no occasion to define the doctrine, or to consider to what extent it applies in a commercial context. On the facts of this particular case, it cannot be said as a matter of law that the trial judge erred in failing to find that Ogus failed to render adequate service to Lesmark.

■ This recital obviously explains why this court did not consider appellant's case to turn on some broad doctrine

that a broker has a duty of full explanation to a client that rendered actionable the failure of Ogus to disclose lack of excavation coverage. We assume that insurance brokers have a responsibility in law to act toward their less expert clients in a way that is responsible in fact. But the exposition of meaningful rules implementing this general obligation should surely await a case not so beset by its own particular facts. Certainly the liability of an insurance broker is shaped by the facts of his relationship with his client. Lesmark as an insured had a history of less than full coverage, deliberately sought, which cuts against any insistence on a general responsibility of a broker to volunteer all manner of information about other available coverage. We have already discussed the infirmities in the proof concerning what Lesmark told its broker about its operations generally. Assuming *arguendo*, that Lesmark did more than talk to Ogus on the phone and actually showed Ogus the specifications, a point not established by proof, we are confronted with the earlier finding of Judge Tamm that Lesmark's acts were in conflict with the specifications! On the facts of this record the implied awareness of Ogus that there was to be excavation cannot be equated with implied awareness that Lesmark was himself going to do the work of excavation (and related supports).

## II

We close with observations about petitions for rehearing *en banc*. They descend upon this court in a flood, reflecting little contemplation of our opinions [3] declaring that they are to be granted sparingly, and our practice under which they are indeed granted sparingly. They take time, and reduce the time available for disposition of cases on the merits. Realistically a court may be unable to fend off such petitions when filed by individuals convicted of crime, or defeated in a civil litigation of major significance in their lives. We would have supposed that no such emotional drive attached to insurance companies accustomed to the realistic appraisal of litigation and rulings.

Our earlier disposition, though without an opinion, came after an oral argument that explored details of the case in a way that meets any standard of attentive consideration that can fairly be associated with appellate review. Our judgment made plain that the case was considered to turn on its particular facts. Doubtless a disposition without a full opinion is not completely satisfactory to counsel or clients. But it is a necessity in the administration of appellate justice under modern docket conditions. Indeed, the President's District of Columbia Crime Commission expressly urged this court to employ to a greater extent the use of "order dispositions," [4] and our rules were amended to reflect this policy.[5]

All who are interested in administration of justice in a large sense are properly concerned lest opinions that in essence turn on particular facts needlessly augment the already large body of reading matter pouring onto law offices and libraries. Too much information input may be as bad as too little, may serve indeed to deaden the senses to the input that is critical. There is need for communication in the public interest—but that implies selectivity, for transmission of "full" information without selectivity

---

3. *See, e. g.,* discussion of sparing grant of *en banc* petitions in opinions of both Judge Danaher for the court, and Judge Fahy, dissenting, in Cafeteria & Restaurant Workers, etc. v. McElroy, 109 U.S. App.D.C. 39, 52–58, 284 F.2d 173, 186–192 (1960) (*en banc*), aff'd, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). *See also* Federal Rules of Appellate Procedure, Rules 40, 35 (effective July 1, 1968), 43 F.R.D. 61, 103–104 101 (1968).

4. Report of the President's Commission on Crime in the District of Columbia 308 (1966).

5. Amendment of Rule 24, April 25, 1967.

may be tantamount to abdication of the duty to communicate meaningfully.[6]

It is often appropriate to publish opinions, with full factual settings identifying and defining the legal principles applied—especially where the facts of a case are a paradigm, or where they are exceptional but serve to illuminate the core of a rule or its qualification; or where fundamental rights are involved. In many cases, however, there is no corresponding need to publish opinions turning on particular facts, and their publication may represent unnecessary expense and paper work, possibly rising in the overall to the level of a hindrance rather than a help to justice.

In the past we have occasionally printed our opinions with directions that they not be published in U.S.App.D.C. or F.2d.

We have recently begun, on an experimental basis, in appropriate cases, issuance of relatively brief opinions in typed form, available to and meaningful to the parties, counsel and others studying the docket, without being printed for general dissemination either to the District bar or for publication in the reports. Perhaps a by-product of this course will be some reduction in the volume of petitions for rehearing.

The petition for rehearing by the division is denied.

So ordered.

FAHY, Senior Circuit Judge (concurring specially):

I join in denial of the petition for rehearing; and I agree that the filing of petitions for rehearing en banc should be on a more selective basis than is occurring. I do not feel justified, however, in joining in the strictures laid to counsel for appellant in this case.

6. Compare the discussion of the problems of excess "noise" drowning out what is significant, in ROBERTA WOHLSTETTER, PEARL HARBOR: WARNING AND DECISION (Stanford U. Press, 1962). Mrs. Wohlstetter concluded that a significant reason why the Government was not suf-

ficiently alerted prior to December 7, 1941, of impending Japanese plans was not the lack of items of information permitting this inference but the fact that these became "lost" in a mass of communications streaming into Washington.