223 N.J. Super. 394 (1988)
538 A.2d 1270
LEONARD WASSERMAN AND MAXINE SCHWARTZMAN, EXECUTRIX UNDER THE LAST WILL AND TESTAMENT OF MIRIAM WASSERMAN, DECEASED, AND RUSSELL SCHWARTZMAN, AN INFANT BY HIS GUARDIAN AD LITEM, MAXINE SCHWARTZMAN, AND MAXINE SCHWARTZMAN, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
WHARTON, LYON & LYON, DEFENDANT/THIRD-PARTY PLAINTIFF/RESPONDENT, AND NEWARK INSURANCE COMPANY, DEFENDANT/THIRD-PARTY DEFENDANT/RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 5, 1988.
Decided March 2, 1988.
*395 Before Judges PRESSLER, BILDER and SKILLMAN.
Alfred F. Avignone argued the cause for appellants (Goldstein, Toto, Romano & Avignone, attorneys; Alfred F. Avignone, on the brief).
William W. Graham argued the cause for respondent Newark Insurance Company (Magee & Graham, attorneys; Philip G. Pagano, on the brief).
Francis Schachtele permitted to argue the cause for respondent Wharton, Lyon & Lyon (Knapp & Blejwas, attorneys).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This controversy arises out of the unilateral deletion by an automobile liability insurer, defendant Newark Insurance Company/Royal Insurance Company, of the underinsured motorist coverage (UIM) it had theretofore included in the policies it had issued to its insured, plaintiff Leonard Wasserman. The questions raised are whether under the circumstances defendant's notice of deletion of UIM benefits previously afforded was effective to deprive the insured of those benefits and whether *396 his insurance broker had a duty, with which it failed to comply, to advise him to purchase available optional UIM coverage.
The triggering event occurred on July 16, 1983, when plaintiff Leonard Wasserman, a retired businessman, his wife Miriam, and their grandson Russell Schwartzman were crossing Ocean Avenue in Bradley Beach, where the Wassermans were then living. According to Wasserman, they were forced to step backwards while in the center of the roadway in order to avoid an unidentified speeding vehicle. As they did so, the Wassermans were struck by a taxicab driven by Robert Guy and owned by Louis Robertson. Mrs. Wasserman suffered fatal injuries. Mr. Wasserman was seriously injured. Russell sustained no serious physical injury but did suffer serious emotional injury.
At the time of the accident, Wasserman was insured by defendant Newark/Royal under an automobile liability policy which provided, among other benefits, liability limits of $100,000/300,000, uninsured motorist coverage (UM) in the same amount, and personal injury protection benefits (PIP). That policy, whose effective date was March 25, 1983 was a six-month renewal of a policy which had been originally issued on September 25, 1982. The September policy, like Wasserman's previous policies, had also provided underinsured motorist coverage (UIM) in the amount of $100,000/300,000. The March 1983 renewal purportedly provided no underinsured coverage at all. As we are given to understand, since the March 1983 coverage was a six-month renewal and not issued at the inception of a policy year, no new policy was then sent to the insured. He received only the declaration page and a notice, of which we will say more hereafter, which is alleged by the insurer to have explained the import of UIM coverage, to have advised him of the deletion of that coverage, and to have informed him of the availability of UIM coverage as an option.
Wasserman on his deposition admitted receiving the notice, asserted that he did not understand it, and conceded that he *397 never discussed it with his insurance broker, defendant Wharton, Lyon & Lyon, either on his or its initiative. It was also his deposition testimony that he had been a client of that broker for some 20 years, that he obtained all of his insurance from it for both his personal and business needs, and that he had always relied on his broker to attend properly to all his insurance requirements. Wasserman had never graduated from high school and had jobs as a factory worker and clerk before he purchased and operated a fish market in Newark, which he sold following the Newark riots when he retired and moved to Bradley Beach.
The July 1983 accident was followed by a multiplicity of legal actions, the first of which was commenced in October 1983 against the owner and driver of the taxicab by Wasserman and Maxine Schwartzman, who sued as executrix of Mrs. Wasserman's estate and as Russell's guardian ad litem. The taxicab was, unfortunately, minimally insured by Aetna Insurance Company under a policy providing for liability limits of $15,000/30,000, which in June 1984 were offered to plaintiffs. The initial offer was refused, and the matter went to arbitration pursuant to N.J.S.A. 39:6A-24 to -35 and the interim rules which preceded the adoption of R. 4:21A. The arbitrator awarded Wasserman $500,000 plus prejudgment interest and awarded the estate of Miriam Wasserman $100,000 plus prejudgment interest. Plaintiffs, unable to locate any other assets of those defendants, finally accepted the policy limits and released them. Of the total policy limit of $30,000, $15,000 was allocated to Wasserman, $14,000 to the estate, and $1,000 to Russell. That action was finally concluded by the entry of a judgment pursuant to R. 4:48A on May 1, 1985.
Two weeks after the institution of this first action, Wasserman and the estate brought a separate action against Newark/Royal and Aetna Insurance Company to recover PIP benefits. While that action was pending, they also sought recovery from Newark/Royal under the uninsured motorist provisions of the policy, claiming that the accident had been caused at least *398 in part by the phantom vehicle out of whose way the victims were stepping when they were struck by the taxi. In December 1984 summary judgment was entered in the PIP action adjudicating Newark/Royal's liability. Several weeks later, the UM claim was settled by the plaintiffs giving Newark/Royal a release in return for a payment of $30,000. Their release of Newark/Royal was executed on December 31, 1984.
The fourth proceeding, the one before us, was commenced in October 1984 prior to the final disposition of any of the earlier ones. Plaintiffs, Wasserman and the estate, filed a complaint against Wasserman's insurance brokers, defendants Wharton, Lyon & Lyon, claiming that Wasserman's failure to have UIM coverage on the date of the accident resulted from their negligent failure to advise him to purchase it.[1] The complaint was served in January 1985, and Wharton responded by the filing of an answer and a third-party complaint against Newark/Royal. The gravamen of the third-party complaint was that the insurance company, not it, had the obligation, with which it failed to comply, properly to advise Wasserman respecting both the deletion of the UIM coverage and its availability as an option. Ultimately, plaintiffs obtained leave to amend their complaint for the purpose of asserting a direct claim against Newark/Royal pursuant to R. 4:8-1(b).[2]
Following discovery, which, as we understand, included the depositions of both Wasserman and a representative of Wharton, both defendants moved for summary judgment dismissing *399 the complaint. The trial judge granted Newark/Royal's motion on the ground that its notice annexed to the March 3, 1983 declaration page was adequate to advise Wasserman both of the import of the deletion of UIM coverage and of his option to purchase substitute coverage. He granted Wharton's motion on the ground that a broker has no obligation to advise a client of matters as to which the client is chargeable with knowledge. He concluded further that the notice from Newark/Royal in fact adequately informed plaintiff, placing upon him the burden of affirmatively seeking further action or advice by the broker. Plaintiffs appeal. We disagree with both of these conclusions and accordingly reverse as to both defendants.
We consider first plaintiffs' claim against Newark/Royal. As we have noted, the automobile liability policies it had issued to Wasserman for at least several years prior to the March 1983 renewal provided for UIM coverage in the amount of Wasserman's own bodily injury liability limits, $100,000/300,000. Consequently, in view of the gravity of the consequences of the accident to its three victims, the unilateral deletion of the coverage deprived them of an additional aggregate of $270,000 in compensation. See generally Longworth v. Ohio Casualty Co., 223 N.J. Super. 174 (App.Div. 1988), respecting the history, import, and operation of UIM coverage. We surmise that the reason for the deletion of the coverage was the 1983 amendment of N.J.S.A. 17:28-1.1, which constituted the Legislature's first recognition of UIM and required every automobile liability insurer to offer that coverage to its insureds as an option up to the amount of the insured's own liability limits but not exceeding $250,000/500,000. We further surmise that because of this legislative mandate, Newark/Royal reconsidered its prior offering of the coverage and concluded that since the Legislature required it as an option, it should be subject to separate additional premium and hence afforded only if affirmatively requested and paid for by the insured. We were also advised at oral argument that had Wasserman requested the coverage in March 1983, the *400 premium cost for limits of $100,000/300,000 would have been something under $10.00. The coverage, as we understand it, had been previously included as part of supplemental UM coverage, and no additional or separate premium had been charged.
In any event, having determined to withdraw the UIM coverage unless separately purchased, the insurer attached to the declarations sheet which represented the renewal of the policy the one-page document which is the subject of this controversy. At the top left of the page is the legend, "Important Notice," in capital letters. The capitalized, centered heading of the document read as follows:

UNINSURED MOTORISTS COVERAGE

POLICIES NEWLY ISSUED ON OR AFTER OCTOBER 1, 1982.
The ensuing text of the document, which we include as an appendix to this opinion, was almost exclusively devoted to explaining uninsured coverage and the statutory UM single limit coverage provided for by the 1983 amendment of N.J.S.A. 17:28-1.1. Not only did its caption make no reference to UIM as opposed to UM coverage, but out of its six paragraphs, UIM coverage was mentioned only in one. That paragraph read as follows:
If you previously had selected Uninsured Motorists Coverage limits higher than the minimum limits required, we included additional coverage for damages caused by an "underinsured motor vehicle". This additional coverage applied to bodily injury and property damage caused by a negligent motorist with liability insurance or other security at limits higher than $15,000/30,000/5,000 but less than your Uninsured Motorists Coverage limits. Under the revised coverage, we have removed this "underinsured" feature from Uninsured Motorists coverage and now may provide it separately. This separate coverage is called Underinsured Motorists Coverage and, when afforded, will apply to bodily injury only.
The notice ended with the following statement
We have outlined only some of the changes introduced in Uninsured Motorists Coverage. We recommend that you read your policy and contact your producer if you have any questions.
*401 It is Newark/Royal's contention that as a matter of law the notice clearly explained to the average layman the import of the UIM deletion and constituted a reasonable offer to make that coverage available at an additional premium. It is our view, however, that at least with respect to UIM coverage, the notice was beyond the effective comprehension of the average layman and that no reasonable offer to provide it as an option was made therein.[3] While we do not undertake to suggest specific formulations by which the document could have explained to the insured precisely what UIM coverage is and what benefits it affords, this notice clearly did not do so. Indeed, it did not even unequivocally and unambiguously inform the insured that the coverage was no longer included in the policy. Thus, it did not say, "You no longer have underinsured motorist coverage but you can purchase it." It said, rather, that this "underinsured feature" has been removed "from Uninsured Motorists Coverage and [we] now may provide it separately." The notice went on to say that, "This separate coverage is called Underinsured Motorists coverage and, when afforded, will apply to bodily injury only." In view of the quoted caption, which gives no notice at all either that UIM coverage is affected or that any coverage is being deleted, an insured could consequently have reasonably concluded from the language employed that UIM coverage was being removed from the UM coverage but not from the policy itself. Moreover, the notice was sent in the same form to all insureds irrespective of their individual policies and by its own terms did apply universally. Thus, the effect of the conditional formulation in the clause "we now may provide it (UIM coverage) separately" was at best ambiguous. It could have meant that the coverage was in fact provided for in some but not all policies being issued or that it would in all cases be *402 provided for only if separately purchased. That latter and apparently intended possibility was, however, never expressly stated. Nor was the nominal additional premium ever mentioned. Nor were instructions given as to precisely how the coverage could be obtained without lapse. Consequently, an insured receiving the notice would have been justified in believing that it was attempting to advise him of a technical rather than a substantive change and that it was nothing to trouble either himself or his "producer" about, even if we were to assume that he understood his producer was his broker.
We do not suggest that the notice was deliberately couched in obfuscatory phraseology. Nevertheless, we are satisfied that an average insured, without special training in law or insurance, could hardly have been expected to understand the message it intended to convey, namely that the UIM coverage included in the policy up to that policy renewal was being deleted but could be continued by the exercise of a nominally priced option. We consequently conclude that the effect of the notice was to deprive the insured of a fair opportunity to exercise the option and thereby to preserve his UIM coverage for a small additional premium. We are therefore persuaded that as a matter of law the notice was an ineffective vehicle for abridging the rights which the insured had had under the policy which was the subject of the renewal.
In Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475, 482-483 (1961), Justice Jacobs reasoned that
When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded "to the full extent that any fair interpretation will allow." * * * Where particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective.
And in Bowler v. Fidelity & Casualty Co. of N.Y., 53 N.J. 313, 327 (1969), it was Justice Francis' observation that

*403 Insurance policies are contracts of the utmost good faith and must be administered and performed as such by the insurer. Good faith "demands that the insurer deal with laymen as laymen and not as experts in the subtleties of law and underwriting." * * * In all insurance contracts, particularly where the language expressing the extent of the coverage may be deceptive to the ordinary layman, there is an implied covenant of good faith and fair dealing that the insurer will not do anything to injure the right of its policyholder to receive the benefits of his contract. The covenant goes deeper than the mere surface of the writing.
Our courts continue to adhere to these principles. See, e.g., Sobotor v. Prudential Property & Cas. Ins. Co., 200 N.J. Super. 333, 342 (App.Div. 1984).
We have no doubt that these constructional principles are as applicable to the notice here in question as they are to the policy itself. Nor do we doubt the failure of the notice to meet the required standards of clarity and fair dealing. We therefore hold that the rights which the insured had to UIM coverage as afforded by the policy of September 1982 survived the notice accompanying the March 1983 renewal, and consequently continued as part of the renewed coverage.
With respect to the continued viability of Wasserman's UIM rights, there remains one question which is raised by the December 31, 1984 release. As heretofore noted, at the time that release was executed, Wasserman had then pending his PIP action against Newark/Royal as well as his UM arbitration claim against Newark/Royal. The complaint in this action had already been filed, but it was not served until January 1985 and Newark/Royal was not joined as a party until February. Wasserman's release purported to release Newark/Royal from all claims against it except for future PIP benefits. Newark/Royal argued before the trial court that the release consequently immunized it from plaintiffs' claim respecting UIM benefits. Plaintiffs argue that the release was never intended to release Newark/Royal from any obligations other than those then pending by way of the PIP action and the UM arbitration. Although a factual question was thus clearly raised, the trial judge did not deal with the issue in his letter opinion, except to conclude that it was moot since, in any event, plaintiffs had no *404 cause of action against the insurer. Thus, the issue as to the intended scope and effect of the release remains unresolved and will have to be settled on the remand.[4]
Finally, we address the issue of the broker's liability. As we understand the trial judge's opinion, he concluded that the broker was entitled to summary judgment dismissing the complaint since, under the circumstances, it had breached no duty which it owed its insured. He based this conclusion on what he regarded as the undisputed fact that plaintiff had been properly noticed by the insurer of a deletion of coverage and "failed to contact his agent after being informed" thereof. We disagree.
Defendant Wharton is a licensed insurance broker, acting as the agent of the insured in placing its client's liability insurance. See N.J.S.A. 17:22-6.2. The relationship between the broker and its client and the resultant duty owed by the broker to him were defined by Rider v. Lynch, 42 N.J. 465, 476-477 (1964), in which the Supreme Court made clear that
One who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. He is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his principal seeks to be protected. If he neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he *405 undertook to supply, because of his failure to exercise the requisite skill or diligence, he becomes liable to his principal for the loss sustained thereby.
* * * * * * * *
Thus, an insurance broker, in dealing with his clients, ordinarily invites them to rely upon his expertise in procuring insurance that best suits their requirements. It is not necessary for the client in order to establish a breach of duty to prove that he laid out for the broker the elements of a contract of insurance. It is sufficient to show that he authorized procurement of the insurance needed to cover the risks indicated and that the broker agreed to do so but failed or neglected to perform his duty. The terms of the contract to procure the insurance, the scope of the risk and subject matter to be covered, may be found by implication. The principal does not sue on a contract of insurance; he seeks recovery for the loss occasioned by the failure to procure such a contract or such a valid contract. [citations omitted]
We have recently applied these principles in the context of optional UM and UIM coverage. In Sobotor v. Prudential Property & Cas. Ins. Co., 200 N.J. Super. 333, 341 (App.Div. 1984), we recognized that "the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies" impose upon brokers the fiduciary duty "to use their expertise with every client...." Thus, "a client should be entitled to rely on the special skill and knowledge possessed by the agent in order to best obtain the desired coverage" and the agent has the correlative obligation not "to withhold information which might prove useful to one seeking coverage simply because the insurance sought is not mandatory." Id. at 339. Accordingly, we affirmed a judgment entered after trial holding the agent liable for a failure to have obtained optional UIM coverage for an insured who had requested the best available automobile insurance package.[5] And in Walker v. Atl. Chrysler Plymouth, 216 N.J. Super. 255 (App.Div. 1987), we relied on Sobotor in reversing a summary judgment which dismissed an insured's claim against a broker who had failed to recommend the purchase of additional UIM *406 coverage. While we noted in Walker the absence of an allegation that the insured had requested such coverage either directly or by implication, we concluded that
Nonetheless, the insured's silence does not necessarily overcome the agent's fiduciary duty to inform the insured of the additional coverage where as here Atlantic [the insured] asserts it totally relied on Sears [the broker]. Considering Sears' specialized professional knowledge and Atlantic's reliance thereon, a jury may find Sears had a duty to inform Atlantic of the additional UIM coverage available as he was well aware Atlantic was relying on his expertise. [216 N.J. Super. at 260-261]
So here. Although the record does not disclose the precise manner in which Wharton itself had learned of the purported deletion of coverage or whether it had seen the notice sent to insureds, it nevertheless conceded at oral argument that it had been aware prior to the March 1983 renewal that Newark/Royal intended to delete the optional UIM coverage from the policies it had previously issued. It was also aware of the availability of that coverage for a nominal extra premium and must be presumed to have been aware of the significance of the coverage. Wasserman's deposition testimony supports his allegation of complete reliance on his broker resulting from their long-term relationship. It is further inferable from Wasserman's deposition testimony that had Wharton recommended the coverage, Wasserman would have purchased it. We are also persuaded, in view of the text of the notice, that factual questions were presented as to whether Wasserman was chargeable with the obligation to seek further explanation from Wharton as to the meaning of the notice. Cf. Citta v. Camden Fire Insurance Assoc., Inc., 152 N.J. Super. 76 (App.Div. 1977); Cox v. Santoro, 98 N.J. Super. 360 (App.Div. 1967) (a broker is not chargeable with the duty of advising an insured of that which he already knows or should know). Moreover, there is at least a question of fact as to whether, in all the circumstances, Wharton had an affirmative obligation to advise Wasserman of the import of the notice and to recommend purchase of optional coverage without waiting to be asked. See Johnson v. Urie, 405 N.W.2d 887 (Sup.Ct.Minn. 1987). It is one thing to contend, *407 as Wharton does, that a broker may not have the obligation in all circumstances to explain to an insured the entire gamut of available coverage. But see Aetna Casualty and Surety Co. v. Walter Ogus, Inc., 396 F.2d 667 (D.C. Cir.1967). It is quite another to rely on that general proposition as a justification for a broker not advising a long-term client that critical coverage which he already has is not only being unilaterally withdrawn but is replaceable at nominal charge.
We conclude that the summary judgment in favor of Wharton was improperly granted since it was based on the erroneous assumption that the insured had been fairly advised of the relevant facts by the insurer and had failed to protect himself. Moreover, we find a sufficient basis in the record to suggest that the broker had a duty with which it failed to comply which was a proximate cause of plaintiffs' monetary loss. Further factual development was therefore required, and the summary judgment was improvidently entered.
The summary judgment appealed from is reversed in its entirety, and the matter is remanded to the trial court for further proceedings consistent herewith.

APPENDIX

IMPORTANT NOTICE

Royal Insurance

UNINSURED MOTORISTS COVERAGE

POLICIES NEWLY ISSUED OR RENEWED ON OR AFTER OCTOBER 1, 1982
The Royal Insurance Company has revised the Uninsured Motorists Coverage in your Policy if you purchased limits higher than the minimum limits required in New Jersey. The minimum limits required are $15,000/30,000/5,000.
If you previously had selected Uninsured Motorists Coverage limits higher than the minimum limits required, we included *408 additional coverage for damages caused by an "underinsured motor vehicle". This additional coverage applied to bodily injury and property damage caused by a negligent motorist with liability insurance or other security at limits higher than $15,000/30,000/5,000 but less than your Uninsured Motorists Coverage limits. Under the revised coverage, we have removed this "underinsured" feature from Uninsured Motorists coverage and now may provide it separately. This separate coverage is called Underinsured Motorists Coverage and, when afforded, will apply to bodily injury only.
With the removal of the "underinsured" feature from Uninsured Motorists Coverage, new or renewal policies issued or renewed on or after October 1, 1982 with higher limits of Uninsured Motorists Coverage will only provide coverage for damages caused by an accident with an "uninsured motor vehicle". The term "uninsured motor vehicle" includes:
(1) a vehicle to which no liability insurance or other security applies.
(2) a vehicle to which liability insurance applies but the limits of the insurance are less than the minimum limits of $15,000/30,000/5,000 required in New Jersey.
(3) a hit and run vehicle.
(4) a vehicle to which liability insurance applies but coverage is denied or the company writing the insurance becomes insolvent.
In addition to the changes described above, we may now provide coverage with a new single limit of liability. Single limit Uninsured Motorists Coverage works exactly the same as single limit Liability Coverage which you may have on your policy in that it gives flexibility to provide more coverage than split limits in certain accident situations.
Example:
If you now have Uninsured Motorists Coverage at the minimum limits described above and you are involved in an accident caused by an uninsured motor vehicle, your Uninsured Motorists Coverage will pay up to $15,000 for injuries to any one person and not more than $30,000 if more than one person is injured and up to $5,000 for damage to your car or other property contained in your car, except for a property damage deductible of $100.
With the new "SINGLE LIMIT" Uninsured Motorists Coverage, your Uninsured Motorists Coverage will pay up to a total of $35,000 for injuries to one or *409 more persons, or to damage to you car or other property contained in your car, or any combination of the above. In this example, the total amount payable will not exceed $35,000. However, the property damage payment, if any, will still be subject to a deductible of $100.
We have outlined only some of the changes introduced in Uninsured Motorists Coverage. We recommend that you read your policy and contact your producer if you have any questions.
NOTES
[1] Wasserman had in fact attempted to raise this issue in the first action against the owner and driver of the taxicab, but his motion for leave to file an amended complaint in order to join the brokers was denied without prejudice to his right to proceed against them by separate action.
[2] There were also claims made by way of amended complaint by Maxine Schwartzman as guardian ad litem of Russell Schwartzman against Hartford Insurance Company which insured a vehicle owned by the Schwartzmans. Those claims are not before us, and we have not been advised of the manner of their disposition.
[3] Plaintiff premises his argument on the Plain Language Law, N.J.S.A. 56:12-1. In our view, the problem here was created not because the notice was not in plain language within the intendment of the Act but because it was unintelligible by any standard and failed reasonably to convey the critical information intended to be conveyed.
[4] A copy of the release was regrettably not included in the appendix of any party. We requested it at oral argument. Having now reviewed it, we are satisfied that it is at least ambiguous as to the scope of the claims subject to the release. The release is not a general release but a release of specific claims referred to by the specific proceeding in which each was respectively raised. Thus, while all claims "under an Uninsured Motorist Endorsement" are among those released, it is only the then pending UM arbitration which is referenced. Moreover, it is not clear that uninsured motorist coverage was intended to include underinsured motorist coverage as well. Thus, while we do not decide the issue, we are satisfied that the text of the release sufficiently supports plaintiffs' position to raise, at the least, a factual question.
[5] As we there noted, despite the request for the best package, the agent provided a policy with UIM coverage having limits of $15,000/30,000 UM although limits of $100,000/300,000 were available for an additional $5.00 premium.