592 A.2d 527

MARY CHENG LIN WANG, AS ASSIGNEE OF RONALD FIORI, AND THERESA FIORI, HIS WIFE, RICHARD FIORI, AND WILLIAM D. FRANKS, PLAINTIFFS–RESPONDENTS, v. THE ALLSTATE INSURANCE CO., AN INSURANCE COMPANY LICENSED TO DO BUSINESS IN THE STATE OF NEW JERSEY, FRANK METZGER, AND NEW JERSEY MANUFACTURERS INSURANCE CO., AN INSURANCE COMPANY LICENSED TO DO BUSINESS IN THE STATE OF NEW JERSEY, DEFENDANTS–APPELLANTS, AND THE ABC AGENCY (FICTITIOUS NAME), A CORPORATION OR PROPRIETORSHIP PROVIDING INSURANCE SERVICE TO THE PUBLIC, JOHN DOE (FICTITIOUS NAME), AND RICHARD ROE (FICTITIOUS NAME), DEFENDANTS.

Argued February 25, 1991—Decided June 26, 1991.

David J. D'Aloia argued the cause for appellants The All-state Insurance Co., and Frank Metzger (*Saiber, Schlesinger, Satz & Goldstein,* attorneys; *David J. D'Aloia* and *Dorothy J. Nemetz,* on the briefs).

*Edward B. Deutsch* argued the cause for appellant New Jersey Manufacturers Insurance Co. (*McElroy, Deutsch & Mulvaney,* attorneys; *William T. McElroy,* of counsel; *Moira E. O'Connell,* on the briefs).

*Gary C. Algeier* argued the cause for respondents (*Rand, Algeier, Tosti & Woodruff,* attorneys; *Ellen S. Bass,* on the brief).

The opinion of the Court was delivered by

O'BRIEN, J.A.D. (temporarily assigned).

This appeal concerns the duty of insurance companies and their agents to advise their insureds, on renewal of a homeowner's policy, of the potential inadequacy of their personal liability coverage.

I

On February 3, 1983, Mary Cheng Lin Wang sustained substantial personal injuries when her car collided with a tree

allegedly because two dogs ran into the roadway in front of her. One of the dogs was owned by Ronald, Theresa, and Richard Fiori, and the other by William and Dorothy Franks. In January 1985, Wang instituted suit for damages for her personal injuries against the Fioris and the Frankses because of their failure properly to control their dogs.

Both the Fioris and the Frankses had homeowner policies containing liability coverage for bodily injury and property damage. The Fioris had purchased their home for $17,500 in 1963, at which time they obtained their homeowner's policy from defendant The Allstate Insurance Co. (Allstate) through its agent, defendant Frank Metzger. The policy contained "family" liability coverage in the amount of $25,000. The Frankses purchased their home for $49,000 in 1977, at which time they obtained their homeowner's policy from defendant New Jersey Manufacturers Insurance Co. (NJM), a direct provider. Their policy too contained personal liability coverage in the amount of $25,000. Both policies had been renewed over the years, with the $25,000 limit in each for personal liability coverage remaining unchanged and were in effect when Wang suffered her injuries.

The Fioris and Frankses notified their respective insurance carriers, Allstate and NJM, of the Wang suit. Each carrier conceded coverage, assigned counsel, and provided a defense for its insured. Because of the substantial injuries claimed by Wang, the potential liability of the Fioris and the Frankses exceeded the liability coverage in their homeowners' policies and they retained personal counsel. Both insurance carriers agreed to deposit their policy limits with the Clerk of the Superior Court. Hence, by separate orders dated April 12, 1985, $25,000 was deposited with the Clerk on behalf of the Fioris and $25,000 was deposited on behalf of the Frankses, creating a fund in the total amount of $50,000.

Because Wang's counsel considered the deposited sum inadequate to compensate for her injuries, settlement negotiations were begun with personal counsel for the Fioris and Frankses.

Counsel for Wang met with the Fioris and their personal attorney on March 25, 1986. According to a certification of Wang's counsel, the Fioris informed him they had "never received any information regarding increasing their liability coverage from either Allstate or Mr. Metzger," and they had "relied on Metzger's expertise and knowledge regarding available insurance coverages and the limits of coverage appropriate in determining their insurance needs." On November 25, 1985, Wang's counsel had met with the Frankses and their personal attorney, at which time Mr. Franks told him he had received no information or advice from NJM suggesting that he increase his liability coverage, characterized in the certification as "unusually low." Franks further said he "had no expertise in the area of insurance and [NJM] had been recommended to him as a carrier which could adequately meet his insurance needs." Based on that information, Wang's counsel concluded that the Fioris and Frankses had viable causes of action against their respective insurance carriers under the standards set forth in *Rider v. Lynch*, 42 *N.J.* 465, 201 *A.*2d 561 (1964), and other cases establishing the duty owed by brokers and insurance companies to their insureds.

Negotiations continued, culminating in a settlement agreement in March 1987. Under the terms of that agreement, judgments were to be entered in favor of Wang and against the Fioris and Mr. Franks in the sum of $600,000 plus prejudgment interest. Mrs. Franks chose not to be a party to the proposed settlement agreement and thus negotiations concerning the Frankses were with Mr. Franks only. For their part, the Fioris and Mr. Franks would assign to Wang any claim or cause of action they had against their insurance carriers, Allstate and NJM, and any agents of those carriers. In consideration for the assignments, Wang agreed to forbear from execution on the consent judgment and, upon conclusion or settlement of her suit as assignee against the insurance carriers, she would provide the Fioris and Mr. Franks with a warrant for satisfaction of the judgment.

In March 1987, Ronald Fiori, his wife, Theresa, and their son, Richard (an additional insured under the Allstate homeowner's policy), executed separate assignments to Wang, for all claims, demands and causes of action against Allstate and its agent. Each assignment describes the acts of Allstate and its agent as

includ[ing] their willful, wanton and intentional violation of my rights under a policy issued for protection from personal liability for damages arising from an occurrence, including a failure to provide appropriate, adequate and professional advice and counsel relating to the terms of renewal of the insurance policy issued to me for coverage on my home, including liability for negligent acts of me and my family, and for the failure to properly counsel and advise regarding the need or advisability to increase liability coverage limits and the failure to put my interest, as the policyholder and client, ahead of their own self-interest; which actions were unreasonable, wrongful, negligent, a breach of duty, a violation of the implied covenant of good faith and fair dealing, and a breach of fiduciary duty, and resulted unnecessarily in uninsured exposure, and underinsured status, and potential personal liability to me[.]

Each assignment incorporates the terms of the settlement. In addition, each of the Fioris agreed to cooperate

as reasonably may be required of me in any case which may be brought by Ms. Wang involving said insurance coverage; said cooperation includes testifying at deposition and/or trial, but is not limited solely to those facets of cooperation.

On April 8, 1987, Mr. Franks signed an identical assignment.

All the settlement negotiations culminating in the execution of the assignments in March and April 1987 were conducted without the knowledge of Allstate and NJM or the lawyers who had been assigned by the carriers to represent the insureds. However, Wang's counsel and personal counsel for the Fioris and the Frankses decided that the terms of the settlement should be discussed in a conference before the court. Thus, on June 9, 1987, the attorney for Wang, private counsel for the Fioris and Mr. Franks, as well as counsel assigned by Allstate and NJM, who were of record in the Wang suit against the Fioris and the Frankses, appeared before the assignment judge to discuss the terms of the settlement. At that conference, the Fioris and Mr. Franks agreed to provide their respective carriers with a release of the covenant to defend and investigate. In return, counsel assigned by the insurance companies agreed

to provide substitutions of attorney in favor of the insureds' personal counsel, who would in turn affix their consents to the proposed consent judgments.

On November 19, 1987, Mr. Franks executed a release and indemnification agreement to NJM. Mr. Franks acknowledged in the release that NJM had fully and properly performed its obligations under the policy, and had retained competent legal counsel to defend him against those claims. He further acknowledged that NJM and assigned counsel had properly and fully investigated and defended the lawsuit and prepared his defense in time for the trial which had been scheduled for June 15, 1987. The release contained a further acknowledgment that NJM and the assigned counsel had not been informed of the negotiations leading to the settlement or execution of the assignment until one week prior to the status conference on June 8, 1987. In consideration of the release, the NJM designated counsel executed a substitution of attorney in favor of Franks' personal attorney. Allstate did not obtain a similar release from the Fioris; nonetheless counsel assigned by Allstate to represent them apparently gave their personal counsel a similar substitution of attorney.

Pursuant to the settlement, the court entered separate consent orders for judgment on March 4, 1988, against the Fioris and Mr. Franks, each in the amount of $600,000 plus prejudgment interest in the amount of $194,983.87, for a total of $794,983.87 plus costs. The orders provide that both judgments represent joint and several liability for the entire amount of the judgment for all defendants except Dorothy Franks. The record does not disclose the disposition of the case as to her. By separate order of March 4, 1988, the court released to Wang the $50,000 deposited with the Clerk, together with any interest it may have earned.

## II

Wang, as assignee of the Fioris and Mr. Franks, filed a six-count complaint in the Chancery Division against Allstate,

Metzger, NJM, and three fictitious parties, seeking reformation of the insurance policies "to provide personal liability coverage limits in an amount sufficient to insure against personal exposure for the losses sustained by plaintiff." The complaint also seeks compensatory damages, attorneys' fees, interest, and costs.

The first count identifies the parties and sets forth the facts of Wang's accident and injuries, and her lawsuit, the insurance policies issued by Allstate and NJM, and the terms of the settlement of Wang's suit. It further states that the settlement was entered into in good faith and that the amount of the consent judgments represent reasonable and fair compensation for Wang's injuries. It also alleges that when the Fioris and Mr. Franks purchased their insurance, "it was their intention that their personal liability coverage carry limits sufficient to adequately protect them against exposure to personal liability for third party losses" and that that intention had continued through each renewal, "giving due consideration to the appreciated value of their homes, inflationary trends, and the increasing recoveries of tort victims." It further alleged that Allstate and NJM "did not adequately protect the Fioris and Mr. Franks from personal exposure to liability and accordingly, did not provide the coverage intended by" them. The complaint alleges that as a proximate result of that conduct the Fioris and Franks were exposed to personal liability for Wang's injuries.

The second count is against only Allstate and Metzger and asserts that the Fioris relied on the knowledge and expertise of Metzger, "who held himself out to the public as an insurance broker knowledgeable about policies of insurance and available coverage, and the amounts of coverage appropriate to insure adequate protection against liability losses." It then alleges breach of the following duty:

> In his capacity as an insurance broker, Metzger owed the Fioris a duty to advise them of the limits of insurance coverage necessary to protect their interests, including, but not limited to a duty to periodically and regularly advise them of a need to increase the limits on that insurance coverage in light

of the appreciated value of their home, inflationary trends in the area, and increased recoveries being awarded to tort victims.

The third count alleges breach of that same duty by Allstate. The fourth count asserts similar allegations concerning NJM. The fifth count asserts a breach of fiduciary duty, and the sixth count alleges a breach of a duty of good faith and fair dealing.

NJM filed an answer, a third-party complaint against Mr. Franks for indemnification, and a counterclaim against Wang. Allstate also filed an answer.

### III

Before any discovery had been conducted, Allstate, Metzger, and NJM moved to dismiss the complaint for failure to state a claim on which relief can be granted. While the motions refer to *Rule* 4:6–2(c), they actually sought dismissal under *Rule* 4:6–2(e). In response, Wang filed the certification of her attorney and the documents executed pursuant to the settlement. Pursuant to *Rule* 4:6–2(e), the court treated the motion as one for summary judgment.

Defendants' motion set forth three bases:

(1) plaintiff irrevocably released the insureds from liability, thereby terminating the insurers' obligation to pay; (2) the insurers had no legal duty to review and advise the insureds continuously as to the sufficiency of coverage; and (3) New Jersey law prohibits assignments of tort claims.

Before the Chancery Division, Wang's counsel argued that the form of settlement used in this case had been sanctioned by us in *Griggs v. Bertram*, 88 *N.J.* 347, 443 *A.*2d 163 (1982). He described the alleged duty as "simply at some point during the course of this insurance broker's relationship with the Fioris [he would] at least advise them there's inflation, verdicts are going up, you might at least think about increasing liability coverage on your home."

The court found defendants did not have the duty alleged by Wang. Concluding that no prior case had established a duty as Wang alleged, the court stated:

I don't find that there is decisional authority that supports that suggestion that the Court ought, on its own to create a new super duty applicable in these situations where there is an unfortunate tort that creates horrible injuries as apparently was the case with Miss Wang and for which, unless somebody like a court after the fact raises the insurance limit she will be left uncompensated for the injuries that she suffered. I say it's for a different and higher court to decide that this super duty does exist and the Court finds there is no decisional authority for its extant and declines to create it itself and on Point Two grants summary judgment.

As a separate and independent basis for dismissal of the complaint, the Chancery Division also found that the irrevocable release granted to the insureds by Wang resulted in their having no legal liability to her, in effect discharging the insurance companies. It did not decide whether the assignment was barred as being an assignment of a tort claim.

The Appellate Division reversed the judgment and remanded. Because it disagreed with the Chancery Division's conclusion on the two points decided, the Appellate Division addressed all three points defendants had raised. The court concluded that the assignment of the claims against the insurance companies, whether denominated tort or contract, did not violate public policy because the assignments had been made to a party who has been injured to the same extent as the insured by the insurance company's or agent's inaction, stating: "In effect, the assignee is asserting his or her own claim to which has been added an assurance that the insured will not separately hold the defendant liable."

Although recognizing that *Griggs* involved the virtual abandonment of an insured by a carrier, the Appellate Division observed that an assignment similar to those used here had been used in *Fireman's Fund Insurance Co. v. Security Insurance Co.*, 72 *N.J.* 63, 367 *A.*2d 864 (1976), in which the carrier had been found to have breached the implied covenant of good faith and fair dealing by not considering an offer to settle for an amount in excess of its policy limit. The Appellate Division concluded that the conduct of the insurance carriers as alleged in this case was sufficient to authorize the insureds to enter into that type of settlement with Wang. It further

concluded that that procedure did not violate the "no action" clause of the policy, which generally precludes suit against the carrier before the insured's obligation has been fully determined by final judgment or by agreement among the claimant, the insured, and the carrier.

Concerning the existence of the duty alleged by Wang, which the court characterized as "[t]he harder issue in this case and one of first impression in the public liability area," the Appellate Division framed the issue as, "whether at the time of the reissuance of a policy an agent has a duty to inform the insured at best generally concerning the inadequacy of the former coverage." It then observed that plaintiff alleged the negligence of the insurance companies and the agent in failing to inform of the need to increase liability coverage despite three factors: "the appreciated value of their [homes], inflationary trends in the area, and increased recoveries being awarded to tort victims." The Appellate Division concluded: "On the pleadings alone we cannot say that no duty exists under the principles of *Rider v. Lynch*, 42 *N.J.* 465, 476, 201 *A.2d* 561 (1964), *Sobotor v. Prudential Property & Cas. Ins. Co.*, 200 *N.J. Super.* 333, 341, 491 *A.2d* 737 (App.Div.1984), and their progeny." The court recognized that the weight of out-of-state authority tended to negate liability, citing *Hardt v. Brink*, 192 *F.Supp.* 879, 880–881 (W.D.Wash.1961); *Jones v. Grewe*, 189 *Cal.App.*3d 950, 956–957, 234 *Cal.Rptr.* 717, 720–721 (1987); *Gabrielson v. Warnemunde*, 443 *N.W.*2d 540, 544 (Minn.1989); *Fleming v. Torrey*, 273 *N.W.*2d 169, 171 (S.D.1978), but concluded that "the issue should be determined here only on a full record."

## IV

■ We granted the insurance companies' and Metzger's petitions for certification, —— *N.J.* —— (1990), and now reverse the Appellate Division and reinstate the judgment of the Chancery Division dismissing the complaint. We conclude there is

no common law duty of a carrier or its agents to advise an insured concerning the possible need for higher policy limits upon renewal of the policy. If such a duty would be in the public interest, it is better established by comprehensive legislation, rather than by judicial decision. Because of those conclusions, we find it unnecessary to decide whether the insureds' hybrid claims against the carriers are legally assignable and whether the settlement terms, including the assignments agreed upon without participation by the carriers, violated the "no action" provisions of the policies. Nor need we address the effect of the terms of the settlement on the liability of the insurance carriers. Although the Chancery Division adopted as a separate basis for summary judgment the contention that the carriers were fully released as a result of the settlement, we express no opinion on that proposition. We therefore turn to the duty alleged by Wang.

### A

Wang's brief suggests neither that carriers or agents should be responsible for reviewing every insured's personal circumstances and on that basis make personalized insurance coverage recommendations, nor that carriers should provide coverage that will protect an insured against any eventuality—an insurance policy "without limits" as described by one of the carriers. Nor does Wang seek to establish a new and expansive duty. Rather, she argues that defendants breached previously-recognized duties of care owed by insurance companies and/or their agents. She contends that

> [i]nsurance agents, who hold themselves out as having expertise in the area of insurance, owe some duty to their insureds to advise them of basic trends in insurance protection and to periodically advise them, in general terms, of the need to continually review the adequacy of their coverage as economic conditions change.

The seminal case in this jurisdiction concerning a broker's liability to an insured is *Rider v. Lynch, supra,* 42 *N.J.* 465, 201 *A.*2d 561, in which we said:

> One who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. He is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his principal seeks to be protected. If he neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he undertook to supply, because of his failure to exercise the requisite skill or diligence, he becomes liable to his principal for the loss sustained thereby. [*Id.* at 476, 201 *A.2d* 561]

The duty ascribed to the broker in *Rider* was the foundation for the Appellate Division's decision in *Sobotor v. Prudential Property & Casualty Insurance Co., supra,* 200 *N.J.Super.* 333, 491 *A.*2d 737, in which the court ordered an automobile insurance policy reformed to increase the uninsured/underinsured motorist (UM/UIM) coverage because of the agent's failure to have provided the insured with the "best available" package of insurance, as the insured had requested. In dictum the Appellate Division said: "We see no reason why the duty owed by a broker to a client should differ from the duty owed by an agent. The difference between a broker and an agent lies in the duties and responsibilities owed to the insurance carrier, not to the insured." *Id.* at 337 n. 1, 491 *A.*2d 737. The Appellate Division concluded that a "duty arises when there is a *special relationship* between the insurance agent and the client which indicates reliance by the client on the agent." *Id.* at 338, 491 *A.*2d 737 (emphasis added).

A proliferation of cases dealing generally with the duty of brokers and agents to insureds concerning UM/UIM coverage followed, the majority of which involved renewal policies. See, *e.g., Walker v. Atlantic Chrysler Plymouth,* 216 *N.J.Super.* 255, 523 *A.*2d 665 (App.Div.1987); *Wasserman v. Wharton, Lyon & Lyon,* 223 *N.J.Super.* 394, 538 *A.*2d 1270 (App.Div. 1988); *Johnson v. MacMillan,* 233 *N.J.Super.* 56, 558 *A.*2d 24 (App.Div.), *rev'd on other grounds,* 118 *N.J.* 199, 570 *A.*2d 962 (1989). Other cases address the duty in light of section 17(b) of The New Jersey Automobile Insurance Freedom of Choice and

Cost Containment Act of 1984, *L.* 1983, *c.* 362, and other statutory requirements. *See Dancy v. Popp*, 114 *N.J.* 570, 556 *A.*2d 312 (1989), *aff'g* 232 *N.J.Super.* 1, 556 *A.*2d 331 (App.Div. 1988); *Avery v. Arthur E. Armitage Agency*, 242 *N.J.Super.* 293, 576 *A.*2d 907 (App.Div.1990); *Sikking v. Nelson*, 242 *N.J.Super.* 185, 576 *A.*2d 311 (App.Div.1990). *But see Bruce v. James P. Mac Lean Firm*, 238 *N.J.Super.* 408, 570 *A.*2d 1 (App.Div.1989), *aff'g* 238 *N.J.Super.* 501, 570 *A.*2d 49 (Law Div.) (agent has no affirmative duty to inform insured regarding UM/UIM coverage when insurer provides notice of availability of additional UM/UIM coverage by mailing of requisite statutory notices); *Pinto v. Garretson*, 237 *N.J.Super.* 444, 568 *A.*2d 119 (App.Div.1989) (agent not liable for failure to communicate directly with insured to recommend purchase of additional UM/UIM coverage where insured received the requisite statutory notice and specifically selected coverage options, and where coverage selection form clearly stated that insured should contact agent to inquire about higher limits of UM/UIM coverage); *cf. Andriani v. New Jersey Mfrs. Ins. Co.*, 245 *N.J.Super.* 252, 584 *A.*2d 875 (App.Div.1991) (no duty to inform on renewal of an automobile policy with minimum UIM coverage when the trial court found insurer notified insured of coverage rights and options and plaintiff never requested "the best insurance available").

## B

Although we agree with the Appellate Division that the record in this case is sparse, it is not "devoid of any factual references other than those asserted in the pleadings by plaintiff." The record includes the settlement documents and the certification of Wang's counsel. Both the Appellate Division and we review the matter on the record made before the Chancery Division. While discovery had not yet begun when the motion was made, plaintiff responded with matters outside the pleadings which were not excluded by the court and the motion then became one for summary judgment. Hence, our

review proceeds as one of a motion for summary judgment. See *Rule* 4:6–2(e).

The question of whether a duty exists is a matter of law properly decided by the court, not the jury, and is largely a question of fairness or policy. *Strachan v. John F. Kennedy Memorial Hosp.*, 109 *N.J.* 523, 529, 538 *A.*2d 346 (1988). "The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solutions." *Kelly v. Gwinnell*, 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984); accord *Goldberg v. Housing Auth. of Newark*, 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962). Of course, the legal determination of the existence of a duty may differ, depending on the facts of the case.

We do not doubt that the principles of *Sobotor* and its progeny dealing with UM/UIM coverage may be applied to public liability coverage in a homeowner's policy. Nor do we exclude the possibility that there might be a set of circumstances under which the duty alleged in this case would arise, based on the "special relationship" found in the *Sobotor* case. However, in this case, no allegations of special relationship were contained in plaintiff's complaint, the assignments themselves, or the certification of Wang's counsel. As the Appellate Division noted, the assignment described the insurance carriers' dereliction as "[f]ailure to provide appropriate, adequate and professional advice and counsel relating to the terms of renewal of the insurance policy ... and for the failure to properly counsel and advise regarding the need or advisability to increase liability coverage limits."

In her complaint, Wang alleged that the duty breached by the insurers required them "to periodically and regularly advise [the insureds] of a need to increase the limits of [their] insurance coverage in light of the appreciated value of their home[s], inflationary trends in the area, and increased recoveries being awarded to tort victims." In the certification of Wang's counsel, he simply reiterated the hearsay statements he had been

told by the Fioris and Mr. Franks. Hence the certification provides no evidence to support the allegations. *See Murray v. Allstate Ins. Co.*, 209 *N.J.Super.* 163, 169, 507 *A.*2d 247 (App. Div.1986) (affidavits must be limited to the affiant's personal knowledge of such facts as to which he is competent to testify and are admissible in evidence). *R.* 1:6–6.

The assignments required the Fioris and Mr. Franks to cooperate with plaintiff in maintaining her claim against the insurance companies. Neither the Fioris nor Mr. Franks, however, submitted an affidavit setting forth the circumstances under which their homeowners' policies had been renewed prior to February 3, 1983. They presented nothing to show the existence of any special relationship, such as that found to be a significant factor in the imposition of liability in the UM/UIM cases. Nor was the report of any expert presented to the Chancery Division, notwithstanding counsel's representation at oral argument before that court that evidence in the form of expert opinion could be presented. Plaintiff had every opportunity to submit any factual matters or expert opinion in defense against the motion, or to ask for additional time to present such material. See *R.* 4:6–2, *R.* 4:46–5(a). The absence of any affidavits from the insureds, as well as the statements attributed to them in counsel's certification, suggest there was no special relationship; rather that the policies had been routinely renewed, probably without any contact between the parties other than the issuance and receipt of the new policy and the issuance and payment of an invoice.

Accepting as true all the allegations in the pleadings, the statements in the assignments, and even the hearsay certification of Wang's counsel concerning the Fioris and Mr. Franks, we are left with the naked contention that when their homeowners' policies were renewed for the period including February 3, 1983, the day Wang was injured, Mr. Metzger and NJM had a duty to inform their insureds that $25,000 was inadequate to protect their assets from potential personal injury or property damage claims because of the appreciated value of their

homes, inflationary trends in the area, and increased recoveries being awarded to tort victims. On the record in this case we are not prepared to find as a matter of law that insurance companies and their agents have such a duty.

That is not to say that a sound basis for the creation of such a duty may not be stated. We disagree with the insurers' contention at oral argument before us that fulfillment of such a duty would be impossible or even substantially inconvenient. In the present age of automation, a form of notice could certainly be generated and sent to an insured with the notice of renewal of his policy suggesting that the limits contained in the existing policy may be inadequate in light of inflation or other economic or social factors. In fact, such a notice would probably represent sound business practice. For example, in this case, the Fioris' policy had been in effect since 1963, when they purchased their home. Presumably, the fire and extended coverage portion of the homeowner's policy issued in 1963 was based on the purchase price of $17,500. The record does not reveal whether that coverage had been increased over the intervening years to reflect the obvious inflationary increase in the value of the home. In response to our inquiry at oral argument, counsel for Allstate told us that if the insurance company automatically increased fire and extended coverage limits, or suggested that insureds do so, that was because that coverage was based on market value coverage. However, if notice of such an increase in fire and extended coverage can readily be given to the insured, either as an accomplished fact or for an insured's decision to purchase, we see no reason why a similar notice could not be given with respect to personal-liability coverage. We recognize that insurance agents and their companies are not necessarily experts in the economy, and it may also be fair to say, as argued by the insurers, that any consumer is, or should be, aware of inflationary factors that have come to bear on all consumer products. However, an insurance company may be in a better position to relate those factors to insurance coverage than is the insured.

The difficulty, however, with finding a duty to give such notice in the setting of a lawsuit, after the insured has become exposed beyond the policy limits is obvious. Initially, insurance companies have not been alerted to the existence of such a duty by prior case law or legislation so as to factor such a risk into premiums. *Rider, Sobotor,* and the many succeeding cases all deal with first-party UM/UIM coverage, not third-party liability coverage in a homeowner's policy. Furthermore, in those cases there usually was evidence of a special relationship, either in the form of an inquiry or request by the insured or a specific representation by the agent or broker. There is no such evidence in this case.

Moreover, the more recent UM/UIM cases consider statutory and regulatory dictates such as *N.J.S.A.* 39:6A–23 and *N.J.A.C.* 11:3–15.1 to 15.11 requiring insurance companies, brokers, and agents to provide written notice, a buyer's guide, and coverage selection forms for new automobile insurance, and *N.J.S.A.* 17:28–1.1, requiring minimum UM coverage and providing for increased coverage for UM/UIM as an option. We note that *N.J.A.C.* 11:3–15.6, establishing the minimum standard in preparation of the buyer's guide, requires that, after stating the required minimum coverages, the explanation of liability coverage must include the following:

> Higher limits of liability coverages are available at relatively low cost. If you cause an accident and don't have enough insurance to cover your legal responsibilities, you then are personally responsible and could lose some of your assets or spend years paying this debt.

There is no comparable statutory duty to notify or provide a buyer's guide or coverage selection form for a homeowner's policy. Of course, the Legislature could create such a duty. For example, *N.J.S.A.* 17:36–5.29 requires every homeowner's policy or other policy providing comprehensive personal-liability insurance to afford coverage against liability for payment of any obligation that the policyholder may incur to an injured domestic servant or household employee or the dependents thereof.

Finally, it is difficult to fix the limits of such a proposed duty. The areas of potential liability are many and growing. Defining the scope of the duty would require us to address issues such as whether a broker or agent should be required to inform the insured of the availability of an umbrella policy to increase the coverage limits. Those and other difficult questions are best left to the legislative process. In that setting, such questions can be fully explored and debated with input from the public and the insurance industry before creation of such a duty.

### V

We reiterate that the many variables arising out of such a duty suggest that its creation and limitations should more properly be the subject of full adjudication or legislation. In the limited context presented to us in this appeal, we are disinclined, as a matter of sound public policy, to announce an absolute duty, henceforth to be adhered to by all affected insurance companies. *See Jackson v. Muhlenberg Hosp.*, 53 *N.J.* 138, 142, 249 A.2d 65 (1969).

The judgment of the Appellate Division is reversed, and that of the Chancery Division dismissing the complaint is reinstated.

*For reversal and remandment*—Chief Justice WILENTZ, Justices HANDLER, O'HERN and GARIBALDI, and Judges O'BRIEN, HAVEY and SHEBELL—7.

*For affirmance*—None.