**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2134-22

RQ FLOORS CORP.,

    Plaintiff-Appellant,

v.

LIBERTY INSURANCE
ASSOCIATES, INC. and
PHILIP ZITO,

    Defendants-Respondents,

and

LIBERTY MUTUAL
INSURANCE and EXCELSIOR
INSURANCE COMPANY,

    Defendants.

_____

        Argued May 21, 2024 – Decided July 14, 2025

        Before Judges Gooden Brown and Natali.

        On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8840-18.

Ryan Milun argued the cause for appellant (The Milun Law Firm, LLC, attorneys; Ryan Milun, on the briefs).

Iram P. Valentin argued the cause for respondents (Kaufman Dolowich & Voluck, LLP, attorneys; Iram P. Valentin and Timothy M. Ortolani, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, P.J.A.D.

Plaintiff RQ Floors Corp. appeals from a January 20, 2023 Law Division order granting summary judgment dismissal of its negligence, breach of duty, and breach of fiduciary relationship claims against its insurance brokers, defendants Liberty Insurance Associates, Inc. (LIA), and Phillip Zito.[1] The claims stem from losses plaintiff sustained in a fire at one of its business locations. Plaintiff also appeals from separate March 3, 2023 orders denying reconsideration[2] and denying an extension of discovery to submit an expert

---

[1] Plaintiff settled with defendants Liberty Mutual Insurance and Excelsior Insurance Company on January 11, 2023.

[2] Nowhere in its merits brief does plaintiff present any legal argument or citation of law on why the trial court erred in denying reconsideration. As a result, plaintiff has effectively waived this argument on appeal. See N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal.").

report.  Based on our review of the record and the applicable legal principles, we affirm.

I.

We glean these facts from the motion record, viewed in a light most favorable to plaintiff as the non-moving party.  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).  Plaintiff, established in 2010, manufactures and sells wood flooring materials.  Leonid Shekhets serves as plaintiff's president, and his wife, Elina,[3] is employed as plaintiff's "bookkeeper" and "office manager."  Defendant LIA is an insurance brokerage company and serves as an agent of the "Liberty Mutual Group."  Defendant Zito is a licensed insurance broker, certified insurance counselor, and associate risk manager.  Zito serves as vice president of LIA's Commercial Division and has worked at LIA for more than thirty years.

Zito maintained a business relationship with plaintiff for years, primarily through Elina.  Zito "procured certain insurance policies" for plaintiff "through initial placement and annual renewals" with the Excelsior Insurance Company, doing business as Liberty Mutual Insurance (Excelsior/Liberty Mutual).  These

---

[3]  We refer to the Shekhets by their first names to avoid any confusion caused by their common surname and intend no disrespect.

3

policies included "commercial property and commercial general liability coverage." Zito visited plaintiff's offices "two to three times a year" to talk with the Shekhets, determine plaintiff's property values and sales volumes, and advise the Shekhets on appropriate insurance coverage types and amounts. Once a policy was procured, Zito would explain its provisions to Elina.

Plaintiff's business originally operated out of one location in Ridgefield. The Ridgefield location had $400,000 of business income and extra expense coverage through Excelsior/Liberty Mutual. In 2014, plaintiff opened a second location in South Hackensack. Elina notified Zito about the expansion and inquired about increasing insurance coverage but was not sure what kind of policy the company needed. To assess the need, Zito asked Elina about the nature and operation of the expanded business. In response, Elina informed Zito that both locations were interdependent and any interruption at one facility would affect the entire business.

In her deposition testimony, Elina asserted that after she explained the nature of the expansion to Zito, he told her that the coverage "should be blanket coverage" and that she first "learn[ed] about . . . blanket coverage" during her conversation with Zito. In a certification submitted in opposition to the summary judgment motion, Elina certified that Zito stated "he would obtain

4

[blanket coverage]" for plaintiff and they "discussed the amount of insurance as $800,000" because he knew plaintiff was "expanding" and "sales and income would be increasing." Her understanding was that blanket coverage would afford $800,000 of insurance "for business interruption" in the event of a loss.

Zito testified at his deposition that he never informed Elina about blanket coverage and the Shekhets never asked him to obtain blanket coverage. Zito explained that $800,000 in coverage would have been "far too much coverage for a company that was only grossing $2.6 million" and $400,000 was enough for a company grossing that amount. According to Zito, an insurance company would not "overinsure a company" so any request for an increase in coverage would have to be supported by "sales figures."

On September 26, 2014, Zito contacted an agent of Excelsior/Liberty Mutual and requested the addition of $400,000 of business income coverage to plaintiff's existing policy for the new location. Zito also inquired whether it was possible to "blanket the two locations" since plaintiff's business involved "moving inventories in different stages of production between locations." He stated his sole purpose of blanketing coverage was to "reduce the [total] premium" plaintiff paid by a "small number." Excelsior/Liberty Mutual declined Zito's request for blanket coverage.

5

Zito followed up with plaintiff by asking Elina to complete a "business income worksheet" (worksheet) in order to gather details about plaintiff's business, including gross sales, inventory, net sales, revenue, and expenses such as cost of goods and services, payroll, and the like. At his deposition, Zito explained that he wanted Elina to complete the business income worksheet to "determine whether or not there was a need to request additional [business income] coverage from the carrier."

Zito's initial request to Elina was contained in an October 6, 2014 email, stating,

> With your business growing, I want to make sure we're adequately covered. The attached form is the perfect guide for determining the limit to use. I'm sure it will be easy for you to complete. Do your best, return it to me, and we'll talk.

Zito then attached the worksheet to the email. When Zito did not receive a response from Elina, he emailed her again on November 21, 2014, stating he "need[ed] to get detailed worksheets to look at."

Without responding to Zito's latest request for the completed worksheet, on November 24, 2014, Elina inquired about the breakdown in cost for the additional coverage. Zito responded that same day:

6

> We added $2,500,000 of stock and equipment to the new location plus liability and it looks like it will cost around $8,000 per year. That's a good price.
>
> You never completed that income application I sent you. We need to do that to determine how much income coverage you need.

The next day, November 25, 2014, at Zito's request, Excelsior/Liberty Mutual increased the business income and extra expense coverage limits from $400,000 at just the Ridgefield location to $400,000 for each location, plus an additional limit of $50,000 for extra expense coverage. As a result, a loss at one location would only permit recovery of the coverage limit of the location that suffered the loss. According to Zito, he wanted "to ensure that [plaintiff] had at least some immediate coverage for the South Hackensack location."

Zito explained that he used "his standard procedure" to determine the "initial amount of appropriate business income coverage" as a "temporary solution" until he received the worksheet to confirm the amount. He calculated the "projected gross sales" for the year by estimating the gross sales from the prior year "[b]ased upon his discussions with the Shekhets" and plaintiff's self-reported income provided to Excelsior to secure general liability insurance coverage. He then calculated a percentage of that projection, 15% to 20%, to estimate the appropriate level of business income coverage.

A-2134-22

After Zito acquired the initial coverage, he again requested the completed worksheet from Elina on December 11, 2014, February 5, 2015, August 21, 2015, and August 28, 2015. In the February 5, 2015 email request to Elina, Zito stated: "Correct me if I'm wrong, but I don't believe you ever sent me the form I gave you to determine the right limit for income coverage, AND I'm sure we're underestimating your sales now that things are humming. The form will resolve everything." Elina replied, "You are right." She explained she "underst[ood Liberty Mutual] need[ed] preliminary [sales] numbers, but [the numbers could not] be [a] totally huge difference."

In her deposition, Elina testified she requested Zito's assistance "in filling out the [worksheet]" but the two did not connect.[4] Zito testified he could not have provided help because he was not an accountant. Elina confirmed that plaintiff retained an accountant to file its tax returns and that the accountant would have had access to financial figures needed to complete the worksheet. Elina also testified that she understood Zito's requests for her to complete the worksheet to mean that the existing coverage might not have been high enough for plaintiff's needs.

---

[4] Elina also provided inconsistent testimony regarding whether or not she even received the worksheet attached to Zito's initial email. However, during discovery exchange, it became apparent that plaintiff received the worksheet.

A-2134-22

Zito never received a completed worksheet. On February 22, 2015, the policy renewed for the same coverage through February 22, 2016. On September 16, 2015, plaintiff's Ridgefield location caught fire. Elina notified Zito of the fire, and Zito filed a claim with the insurer on plaintiff's behalf. The insurer paid plaintiff $450,000, $400,000 for business income and an additional $50,000 for extra expense coverage.

In her opposing certification, Elina averred plaintiff was never told by defendants "that there was no blanket coverage in place in the amount of $800,000." Elina testified in her deposition that every time she and her husband discussed the policy with Zito after their initial conversation, Zito gave them the impression that he would obtain blanket coverage and confirmed that he had secured blanket coverage after he added the South Hackensack location.[5]

Elina also certified that despite her requests for the policy and "the fact that in the past, . . . Zito would deliver the policies of insurance to [her] at the

---

[5] In her certification, Elina calculated the ultimate business interruption loss to be "in the area of $1.2 million." At his deposition, Zito testified that Elina sent him an audit form after the fire stating that plaintiff's gross sales from March 2015 to February 2016 were $5 million. However, she later instructed him to disregard that figure and resubmitted the form listing approximately $2.5 million instead. Although plaintiff reported gross sales ranging from about $5.3 million to $6.9 million on its 2013 to 2015 federal income tax returns, it never provided that information to defendants.

A-2134-22

office," Zito never provided her with "the policy for the February 2015 through February 2016 renewal." Instead, in response to her request, Zito said "it was too complicated for [her] to understand and asked what [she] wanted to know about."[6]

The fire resulted in significant damage to plaintiff's machinery at the Ridgefield location. Plaintiff had two dust collection machines that pre-existed its lease of the building,[7] but the machines were removable equipment and not permanent fixtures. Although only one of the dust collection machines and the connecting duct work was damaged as a result of the fire, the fire department's inspection of the premises determined that neither machine was up to code. Neither the Shekhets nor Zito was aware of the code issue.

Although the required code upgrade necessitated the replacement of both machines, given plaintiff's equipment coverage in the policy, the insurer only paid to replace the machine that was actually damaged in the fire. Plaintiff would have needed code upgrade insurance coverage to be reimbursed for the undamaged machine, but plaintiff never asked Zito to procure that type of

---

[6] Elina admitted in her deposition testimony that she did not read the previous years' policies when Zito sent them due to their length.

[7] A woodworking company had previously operated at the Ridgefield location and had left behind the two dust collection systems.

insurance coverage.  Zito also testified that it would have been impossible to obtain code upgrade insurance for the machines because such coverage is part of building coverage, and the machines were not fixtures.

After the fire, plaintiff shifted part of its production to the South Hackensack location and saw a decrease in its production of solid hardwood and mosaic parquet flooring.  In April 2017, plaintiff resumed operations at Ridgefield and returned to full production.

On December 10, 2018, plaintiff filed a six-count complaint against defendants LIA, Zito, Liberty Mutual Insurance, and Excelsior Insurance Company.  Counts one and four specifically named defendants LIA and Zito, collectively, defendants.[8]  In count one, plaintiff alleged damages in the amount of $400,000 resulting from defendants' "negligence, breach of duty, and breach of fiduciary relationship arising from defendants' position as producer/broker/agent."

Specifically, plaintiff asserted defendants were negligent in failing "to obtain the proper coverage."  According to the complaint, defendants should have obtained "$800,000 of business interruption and extra expense coverage

---

[8] Counts two and five demanded reformation of the policy, and counts three and six were against Excelsior/Liberty Mutual only.

A-2134-22

. . . on a blanket basis," so that the coverage amount would have been available regardless of where the claim arose. Plaintiff also alleged defendants were negligent in "fail[ing] to advise plaintiff . . . if the blanket insurance was unavailable" so that it "could seek coverage[] elsewhere." In count four, plaintiff alleged defendants negligently failed to acquire proper coverage for their dust collection machinery and duct work, and also failed to notify plaintiff it did not have proper coverage "so [it] could obtain such coverage elsewhere."

Defendants filed a contesting answer and separate defenses on March 22, 2019. The discovery end date (DED) was set for January 31, 2022. On March 15, 2022, the trial judge issued a trial notice and advised the parties that trial was scheduled for June 20, 2022. At plaintiff's request, the judge adjourned the trial to October 11, 2022.[9] On June 21, 2022, after the DED, the judge conducted a case management conference during which he informed plaintiff that it had to submit a motion to extend discovery to provide an expert liability report. On August 12, 2022, after plaintiff failed to file a motion to extend discovery, defendants moved for summary judgment, arguing that because there was no evidence of a special relationship between plaintiff and defendants, the

---

[9] Despite the DED, Zito's deposition was conducted on February 17, 2022, and April 26, 2022.

professional negligence claims required expert testimony, which plaintiff failed to produce.

After multiple adjournments, most of which were requested by plaintiff, the judge heard oral argument on defendants' motion on January 20, 2023. On the same date, the judge entered an order granting defendants summary judgment and dismissing counts one and four with prejudice. In an accompanying oral opinion, at the outset, the judge found that plaintiff's opposition to the motion was "procedurally deficient" for failure to comply with Rule 4:46-2(b) and Rule 4:46-5(a). According to the judge, plaintiff "failed to cite any portion of the record in its response [to] defendants' statement of facts." As such, "all defendants' alleged statements [were] deemed admitted for the purpose of th[e] motion."

Despite the procedural deficiency, the judge "address[ed] the . . . merits[,] assuming th[at] . . . plaintiff . . . had actually complied with the rule." After discussing the facts, procedural history, and governing legal principles, the judge determined there was "no evidence that . . . there was a special relationship" between Zito and plaintiff. According to the judge,

> [p]laintiff alleges nothing more than a typical relationship between the insurance broker and a client. Zito met with the insured, learned about the business, and used his . . . professional expertise and experience

to identify the appropriate types of coverage and the limits.

> Plaintiff's contention that because Zito suggested that [$]800,000 was an appropriate level of insurance, he went beyond the duties normally associated with an insurance broker is not persuasive. That's precisely what a broker such as Zito need[s] to do. If . . . there was a special relationship in this case, there would be a special relationship in every broker case. Plainly that's not the law. A . . . special relationship is the exception and it exists only when the broker assumes duties in addition to the normal broker/insured relationship.

The judge stated further that Elina's certification did not support plaintiff's contention that "Zito made a promise to obtain [blanket coverage]," as "[a]ll [Elina was] willing to say" was that Zito suggested to her that $800,000 would be "an appropriate level of insurance" coverage. The judge explained that "a conversation" was "not a promise" that would give rise to liability under a special relationship theory if "he failed to do that."

Because the claims "involve[d] professional negligence," the judge then determined that plaintiff's failure to "advance expert testimony establishing an accepted standard of ca[re]" was fatal to its case. The judge expounded:

> [D]efendants served an interrogatory requesting that plaintiff identify any experts upon which plaintiff intended to rely. . . . Plaintiff responded that any experts would be identified at [a] later date. And plaintiff never identified any experts and does not contend that it did.

14

This case involves complex insurance issues including the appropriate limits of business income and extra expense coverage that should have been secured after [plaintiff] opened the South Hackensack location. Whether . . . blank[et] coverage should have been obtained, and, if so, the amount of coverage. Whether such coverage . . . could have been obtained based on [plaintiff]'s business at the time. Whether the broker should have identified the potential code and coverage issues relating to the dust collection system in the Ridgefield location. And whether such coverage was available.

. . . [A]ll of these issues are plainly beyond the ken of the average juror, and without expert testimony, the jury would be left speculating about the broker's alleged duties and whether a breach of those duties proximately caused plaintiff's . . . damages.

The judge thus rejected plaintiff's contention that the common knowledge doctrine applied to obviate the need for expert testimony. He also determined that plaintiff's affidavit of merit did "not satisfy plaintiff's obligation to identify an expert for purposes [of] trial" as the affidavit provided expressed a "conclusory" opinion that defendants' conduct "fell outside accepted professional standards and practices of an insurance broker," gave "no basis" for this conclusion, and did not "specify any applicable duty or breach of duty."

On February 8, 2023, plaintiff moved for reconsideration of the order granting summary judgment. Shortly thereafter, on February 15, 2023, plaintiff filed a motion to extend discovery to retain an expert. In support of the latter

15

motion, plaintiff submitted a certification of counsel recounting that "[a]fter commencement of the action," plaintiff had "filed an [a]ffidavit of [m]erit by Philip Lieberman of Lieberman Consulting Services, LLC," who, upon receipt of Zito's deposition transcript, was asked to prepare an expert report regarding defendants' "professional liability."

According to plaintiff's counsel, while awaiting the report, he received a letter from Lieberman dated October 19, 2022, indicating that the report would not be completed for "at least seven to ten more days" because "[Lieberman's] office had been hacked[,] substantially impairing the use of his computer system." Thereafter, Lieberman notified plaintiff's counsel in an undated communication that due to "a combination of age and other factors, he was retiring from professional consulting duties" and would not be able to complete "a final report for submission to . . . defendants." In the motion to extend discovery, plaintiff's counsel sought an order allowing the retention of "a substitute professional insurance liability expert within thirty days from the date of the entry of the order," with "[a]ppropriate time . . . for the defense to depose the proposed expert and submit a report thereafter of its own expert."

On March 2, 2023, the judge heard oral argument on plaintiff's motions. In separate orders dated March 3, 2023, the judge denied both motions. In

support, the judge placed an oral opinion on the record on March 2, 2023. For the motion for reconsideration, the judge noted that plaintiff was "simply rehashing the arguments made on the initial motion."

However, regarding plaintiff's difficulty finding an expert, the judge stated:

> Not only . . . were those arguments not ever made, and, clearly, they could have been made because . . . if . . . plaintiff was having trouble finding an expert, . . . plaintiff had months and months. . . to tell me that [it was] having trouble finding an expert. . . . In fact, the [only] argument that was made [in opposition to the summary judgment motion] was that they didn't need an expert.

Because this argument was a new argument, the judge concluded that it was barred on a motion for reconsideration. See Medina v. Pitta, 442 N.J. Super. 1, 18 (App. Div. 2015) (explaining that a reconsideration motion "does not provide the litigant with an opportunity to raise new legal issues that were not presented to the court in the underlying motion").

The judge continued:

> I don't find any basis to . . . reconsider my decision . . . regarding the special relationship. There is nothing unique about this case or unusual about this case. This is a standard . . . broker/client relationship. This is not a special relationship case. . . .

. . . I am not even remotely persuaded that you don't need an expert. . . . [T]his is a complicated insurance brokerage liability case. . . . [P]laintiff has to establish that it was a deviation from the standard of care for . . . Zito not to obtain, in this case plaintiff contends $800,000 in blanket coverage for the business. . . . That would require expert testimony on . . . the issue of . . . whether [$]800,000 was appropriate, and whether failure to obtain $800,000 [in coverage] was a deviation from the standard of care.

Further, the judge again rejected plaintiff's argument that the common knowledge doctrine abrogated the need for an expert because "[t]here is no evidence" that defendants "promised to get . . . $800,000 worth of blanket coverage" for the business. According to the judge, Elina would only "certif[y] . . . that [she and Zito] discussed [that figure]." Likewise, the judge explained that "whether the coverage should have included code upgrade coverage" was "plainly the subject of expert testimony."

As to the motion to extend discovery, the judge found that plaintiff had "ample time[,] [y]ears, in fact, to obtain an expert" and "chose not to get [one]." Instead, plaintiff "approach[ed] th[e] case . . . from the standpoint . . . that . . . plaintiff didn't need an expert." Thus, the judge found "no support" for the motion and rejected plaintiff's claim that there were "extraordinary circumstances." This appeal followed.

18

On appeal, plaintiff argues the judge erred in granting summary judgment because "[a]n expert is not necessary to establish the special relationship between [plaintiff] and Zito."  Further, according to plaintiff, "under the common knowledge doctrine," defendants' "carelessness . . . in failing to secure the coverage promised and failing to inform [plaintiff] of its inability to secure the coverage[] is readily apparent to anyone of average intelligence," obviating the need for expert testimony.  Plaintiff also asserts that having established that defendant "had a duty to secure the coverage promised or inform [plaintiff] that the coverage was not in place," "[g]enuine material disputes of fact exist as to [defendants'] breach of duty" to withstand summary judgment.  Likewise, plaintiff argues "a material dispute of fact existed" as to Zito's "failure to recommend code upgrade coverage."  Additionally, plaintiff contends it "should have been given additional time to secure an expert after the abrupt retirement of its expert late in the litigation" and the judge's refusal to find exceptional circumstances constituted an abuse of discretion.

## II.

Our review is guided by established principles of jurisprudence.  "[W]e review the trial court's grant of summary judgment de novo under the same

standard as the trial court."  Templo Fuente De Vida Corp. v. Nat'l Union Fire

Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016).  That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion.  On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted.
>
> [Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016) (citations omitted) (quoting R. 4:46-2(c)).]

Whether a genuine issue of material fact exists depends on "whether the

competent evidential materials presented, when viewed in the light most

favorable to the non-moving party in consideration of the applicable evidentiary

standard, are sufficient to permit a rational factfinder to resolve the alleged

disputed issue in favor of the non-moving party."  Brill, 142 N.J. at 523.

However, "Rule 4:46-2(c)'s 'genuine issue [of] material fact' standard mandates

that the opposing party do more than 'point[] to any fact in dispute' in order to

defeat summary judgment."  Globe Motor Co. v. Igdalev, 225 N.J. 469, 479

(2016) (alterations in original) (quoting Brill, 142 N.J. at 529).

"If there is no genuine issue of material fact, we must then 'decide whether

the trial court correctly interpreted the law.'"  DepoLink Ct. Reporting & Litig.

20

Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). "We review issues of law de novo and accord no deference to the trial judge's [legal] conclusions . . . ." MTK Food Servs., Inc. v. Sirius Am. Ins. Co., 455 N.J. Super. 307, 312 (App. Div. 2018).

"[S]ummary judgment cannot be defeated if the non-moving party does not 'offer[] any concrete evidence from which a reasonable juror could return a verdict in [that party's] favor[.]'" Housel v. Theodoridis, 314 N.J. Super. 597, 604 (App. Div. 1998) (second and fourth alterations in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). As such, "[s]ummary judgment should be granted, in particular, 'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Thus, the non-moving party "has the 'burden of producing . . . evidence that would support a jury verdict[,]' and must 'set forth specific facts showing that there is a genuine issue for trial.'" Housel, 314 N.J. Super. at 604 (alteration in original) (quoting Anderson, 477 U.S. at 256).

Procedurally, a "party opposing [a summary judgment] motion shall file a responding statement either admitting or disputing each of the facts in the movant's statement." R. 4:46-2(b).  Pursuant to Rule 4:46-2, a trial court must decide a motion for summary judgment based only upon the "factual assertions . . . that were . . . properly included in the motion [for] and [opposition to] . . . summary judgment."  Kenney v. Meadowview Nursing & Convalescent Ctr., 308 N.J. Super. 565, 573 (App. Div. 1998).  Reviewing courts should also only consider "those [properly included] factual assertions" on appeal.  Ibid.; see also Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 378 n.3 (2010) ("[We are] bound by the summary judgment factual record developed before the trial court . . . .").

While a non-moving party is entitled to the benefit of all favorable inferences in opposing summary judgment, R. 4:46-2(c), a non-moving party's bare conclusions without factual support by way of a proper certification or affidavit shall not defeat a summary judgment motion, R. 4:46-5(a).  Affidavits or certifications submitted by the non-moving party must either cite to the record as required by Rule 4:46-2(b) or meet the personal knowledge requirements of Rule 1:6-6.  R. 4:46-5(a).

Here, we agree with the judge that plaintiff's opposition to the summary judgment motion was procedurally deficient for failure to comply with Rule 4:46-2(b) and Rule 4:46-5(a). Nonetheless, turning to the merits,

> [n]egligence is conduct which falls below a standard recognized by the law as essential to the protection of others from unreasonable risks of harm. In the usual negligence case, it is not necessary for the plaintiff to prove the standard of conduct violated by the defendant. It is sufficient for plaintiff to show what the defendant did and what the circumstances were. The applicable standard of conduct is then supplied by the jury which is competent to determine what precautions a reasonably prudent [person] in the position of the defendant would have taken.
>
> [Fantini v. Alexander, 172 N.J. Super. 105, 108-09 (App. Div. 1980) (quoting Sanzari v. Rosenfeld, 34 N.J. 128, 134 (1961)).]

However, in an ordinary professional negligence case, "the jury is not competent to supply the standard by which to measure the defendant's conduct," and the applicable standard of practice "must be established by expert testimony." Sanzari, 34 N.J. at 134-35. "In such cases, if the plaintiff does not advance expert testimony establishing an accepted standard of care," dismissal is appropriate. Id. at 135. Expert testimony is also required in a professional negligence case to establish that a deviation from the standard of care proximately caused the damage. Gardner v. Pawliw, 150 N.J. 359, 375 (1997).

The standard of care encompasses a duty of reasonable care. "It is settled that to render a person liable on the theory of negligence there must be some breach of duty, by action or inaction, on the part of the defendant to the individual complaining, the observance of which duty would have averted or avoided the injury." Brody v. Albert Lifson & Sons, Inc., 17 N.J. 383, 389 (1955). Determination of whether a duty exists "turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993). "Th[is] inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solutions." Wang v. Allstate Ins. Co., 125 N.J. 2, 15 (1991) (quoting Kelly v. Gwinnell, 96 N.J. 538, 544 (1984)). "The question of whether a duty exists is a matter of law properly decided by the court, not the jury . . . ." Ibid.

"The import of the fiduciary relationship between the professional and the client is no more evident than in the area of insurance coverage." Aden v. Fortsh, 169 N.J. 64, 78 (2001). The requirement to act in a "fiduciary capacity" stems not only from "'the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies,'" but also

A-2134-22

from the theory that an insurance broker "'ordinarily invites [clients] to rely upon [the broker's] expertise in procuring insurance that best suits their requirements.'" Id. at 78-79 (first alteration in original) (first quoting Walker v. Atl. Chrysler Plymouth, Inc., 216 N.J. Super. 255, 260 (App. Div. 1987); and then quoting Rider v. Lynch, 42 N.J. 465, 477 (1964)). As such, a broker owes a common law duty "to exercise good faith and reasonable skill in advising insureds." Id. at 79 (quoting Weinisch v. Sawyer, 123 N.J. 333, 340 (1991), superseded on other grounds by statute, N.J.S.A. 17:28-1.9).

As our Supreme Court recently explained:

> An insurance broker "is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which [a] principal seeks to be protected." Aden, 169 N.J. at 79 (quoting Rider, 42 N.J. at 476). The broker's duties are . . . "(1) to procure the insurance; (2) to secure a policy that is neither void nor materially deficient; and (3) to provide the coverage he or she undertook to supply." President v. Jenkins, 180 N.J. 550, 569 (2004). "If an agent or broker fails to exercise the requisite skill and diligence when fulfilling those obligations, then there is a breach in the duty of care, and liability arises." Ibid.; accord George J. Kenny & Frank A. Lattal, New Jersey Insurance Law § 10-8, at 316 (2022) ("If the broker neglects to procure the appropriate insurance coverage or if the policy obtained is void or materially deficient or does not provide the coverage the broker undertook to obtain, then the broker becomes liable to the principal for the resulting loss."). As we have observed, "insurance companies

25

and brokers have a duty to advise insureds of their coverage needs where the insurer is aware of a particular peril." Sears Mortg. Corp. v. Rose, 134 N.J. 326, 349 (1993). "The concept is essentially one of professional malpractice." Aden, 169 N.J. at 79.

[Holm v. Purdy, 252 N.J. 384, 404-05 (2022) (citations reformatted).]

"Ordinarily, insurance brokerage is a field beyond the ken of the average juror," thereby requiring expert testimony. Satec, Inc. v. Hanover Ins. Grp., Inc., 450 N.J. Super. 319, 334-35, (App. Div. 2017). However, under the common knowledge doctrine, a plaintiff need not use an expert to prove "'obvious' cases of negligence where a broker's conduct does not comport with [the common law standards referenced in] Rider, 42 N.J. at 476." Satec, 450 N.J. Super. at 335 (citation reformatted). Still, in such cases, the common knowledge doctrine "is to be construed narrowly." Id. at 334 (citing Hubbard ex rel. Hubbard v. Reed, 168 N.J. 387, 395-96 (2001), superseded on other grounds by statute, N.J.S.A. 2A:53A-27).

Alternatively, the "special relationship" theory of liability is "not one based on [an] insurance agent's professional training or standards." Triarsi v. BSC Grp. Servs., LLC, 422 N.J. Super. 104, 117 (App. Div. 2011). "Instead, the basis of the claim is that the insurance agent 'assume[d] duties in addition to those normally associated with the agent-insured relationship' [through] conduct

that invited [the insured's] detrimental reliance." Ibid. (first alteration in original) (quoting Glezerman v. Columbian Mut. Life Ins. Co., 944 F.2d 146, 150 (3d Cir. 1991)). This claim "depends on proof of the parties' conduct" as opposed to "'a deviation from a professional standard of care.'" Ibid. (quoting Syndicate 1245 at Lloyd's v. Walnut Advisory Corp., 721 F. Supp. 2d 307, 315 (D.N.J. 2010)). As such, the claim "does not require expert testimony to establish the existence of a professional standard of care pertaining to insurance professionals." Ibid.

In evaluating such claims, courts examine the record for evidence of greater responsibilities taken on by a broker, such as the broker "expressly contract[ing] to assume additional duties," Sobotor v. Prudential Prop. & Cas. Ins. Co., 200 N.J. Super. 333, 339 (App. Div. 1984), superseded on other grounds by statute, N.J.S.A. 17:28-1.9, or the presence of an "arrangement, custom or course of dealing between [the] plaintiff[] and [broker] other than the ordinary insurer-insured relationship," Citta v. Camden Fire Ins. Ass'n, Inc., 152 N.J. Super. 76, 78 (App. Div. 1977). The length of the parties' relationship and their relative expertise can also be relevant. See Glezerman, 944 F.2d at 151; Sobotor, 200 N.J. Super. at. 340-42.

27

In Wang, our Supreme Court addressed the foundation for the duty found in Sobotor, where this court ordered the reformation of an automobile insurance policy to increase the coverage based on the special relationship between the agent and the insured and the agent's failure to provide the insured with the "best available" package of insurance as the insured had requested. Wang, 125 N.J. at 13 (citing Sobotor, 200 N.J. Super. at 336-38, 341-43). While acknowledging that a "special relationship" showing an insured's reliance upon a broker could trigger liability, the Wang Court rejected the plaintiff's request to impose such a duty upon insurers that would "require[] them 'to periodically and regularly advise [the insureds] of a need to increase the limits of [their] insurance coverage" because there were "no allegations of [a] special relationship." Id. at 15-17 (second and third alterations in original). The Court determined "the obligation to inform homeowners renewing their policies to consider higher liability limits was not encompassed by the recognized duty of care owed by agents to their insureds and, therefore, should be imposed, if at all, by the Legislature." Carter Lincoln-Mercury, Inc. v. EMAR Grp., Inc., 135 N.J. 182, 190 (1994) (citing Wang, 125 N.J. at 18-19).

Here, we agree with the judge that an expert was needed for plaintiff to prove its professional negligence claims against defendants, and we reject

plaintiff's argument that either a special relationship with Zito or the common knowledge doctrine obviated the need for an expert report. In its attempt to establish a special relationship, plaintiff alleges Zito acted not just as a broker but as a "risk manager" by inspecting plaintiff's premises and equipment over the years, making recommendations on coverage type and amount, and inducing plaintiff's reliance on his expertise. Relying on this special relationship, plaintiff asserts defendants are liable for Zito's failure to obtain appropriate business income coverage and to secure code upgrade coverage that would have reimbursed plaintiff for replacing the dust collection machine that was not damaged in the fire.

We are unpersuaded by plaintiff's "special relationship" argument and agree with the judge that Zito's actions were within the normal scope of a broker's duties. "An insurance broker 'is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which [a] principal seeks to be protected.'" Holm, 252 N.J. at 404-05 (quoting Aden, 169 N.J. at 79). Although the parties dispute whether Zito told Elina about blanket coverage prior to the fire, the record is clear that there was no express undertaking or promise by Zito to obtain $800,000 in blanket coverage.

Elina informed Zito about the expansion, the need for the new location to be added to the policy, and the interdependent nature of both locations. Although Zito's preliminary attempt to obtain blanket coverage failed, he added the second location to plaintiff's policy at $400,000 of business income coverage as a temporary measure while he attempted to acquire financial information from Elina to justify an increase in coverage with the insurer. Despite persistent efforts, it is undisputed that Elina failed to complete the worksheet to facilitate such a request. Thus, if plaintiff was underinsured, it was the direct result of its own inaction. See President v. Jenkins, 357 N.J. Super. 288, 308 (App. Div. 2003) ("[A]bsent notice or a specific initiating inquiry from the client, it has been held that an insurance broker has no affirmative duty to advise an insured of gaps in . . . insurance coverage."), aff'd in part, rev'd in part on other grounds, 180 N.J. 550 (2004).

Similarly, as to the dust collection machinery, Zito never held himself out to plaintiff as an expert in code upgrade coverage, nor did he expressly contract to provide such a service. Plaintiff never requested the coverage, and both plaintiff and Zito were entirely unaware of the "particular peril" of the machines not being up to code. See Sears, 134 N.J. at 349. Critically, plaintiff presented no evidence to counter Zito's testimony that it would have been impossible to

procure code upgrade coverage anyway, since the machines were not fixtures. See Clohesy v. Food Circus Supermarkets, 149 N.J. 496, 503 (1997) ("Foreseeability that affects proximate cause . . . relates to 'the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff' reasonably flowed from defendant's breach of duty." (quoting Hill v. Yaskin, 75 N.J. 139, 143 (1977))).

We also reject plaintiff's claim under the common knowledge doctrine because Zito's actions in securing only $400,000 of business income coverage is far afield from the narrow class of "obvious" negligence cases that do not require expert testimony. Satec, 450 N.J. Super. at 334-35. As the judge stated, this coverage was "only materially deficient if . . . Zito did not obtain the level of coverage . . . that a diligent broker should have obtained." Without an expert, plaintiff cannot demonstrate whether Zito's actions constituted a deviation from the accepted standard of care of a New Jersey insurance producer.

Plaintiff contends that Zito's alleged promise to obtain $800,000 of blanket coverage supports its theory of negligence under the common knowledge doctrine. Indeed, "[a]n insurance broker may be held liable for his [or her] failure to exercise the requisite skill or diligence [by failing] to issue the insurance policy he [or she had] promised to procure." Bates v. Gambino, 72

31

N.J. 219, 225 n.2 (1977) (quoting Cox v. Santoro, 98 N.J. Super. 360, 365 (App. Div. 1967), disapproved of on other grounds by Harr v. Allstate Ins. Co., 54 N.J. 287 (1969)).

However, under the circumstances, Zito obtaining $400,000 of "unblanketed" coverage for the second location does not rise to the level of "obvious" negligent conduct. Satec, 450 N.J. Super. at 335; see Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 2.3 on N.J.R.E. 702, at 771 (2025-2026) ("[A] jury should not be allowed to speculate without the aid of expert testimony in an area where laypersons could not be expected to have sufficient knowledge or experience.").

Indeed, cases applying the common knowledge doctrine in the insurance brokerage context have only done so where a broker lacked the knowledge required by law or the plaintiff remained uninsured or had complete exclusions in coverage, none of which occurred here. See, e.g., Bates, 72 N.J. at 222-23, 225 (finding broker negligent for ignorance of regulation that would have provided temporary coverage to client); DiMarino v. Wishkin, 195 N.J. Super. 390, 393-94 (App. Div. 1984) (affirming finding that broker was liable where he failed to produce coverage or promptly warn client that coverage could not be obtained); Marano v. Sabbio, 26 N.J. Super. 201, 204, 207-08 (App. Div.

1953) (same); <u>Rider</u>, 42 N.J. at 480-82 (reversing dismissal of claims for same reasons) <u>Barton v. Marlow</u>, 47 N.J. Super. 255, 260-61 (App. Div. 1957) (same); <u>cf.</u> <u>Satec</u>, 450 N.J. Super. at 324-27, 334-35 (declining to apply the doctrine even where an exclusion for flood insurance rendered plaintiff without reimbursement). Accordingly, expert testimony was required to assist the jury relative to the intricacies of the fiduciary relationship between Zito and plaintiff and any breach of duty that may have occurred. <u>See</u> <u>Triarsi</u>, 422 N.J. Super. at 115-16.

In sum, because neither the special relationship nor common knowledge doctrine applied, summary judgment dismissal of counts one and four was properly granted due to plaintiff's failure to provide an expert report. In the absence of expert testimony, plaintiff could not prove as a matter of law its professional negligence claims.

We now turn to the denial of plaintiff's motion to extend discovery to allow for the submission of an expert report. "Our scope of review of this procedural ruling is a narrow one." <u>Quail v. Shop-Rite Supermarkets, Inc.</u>, 455 N.J. Super. 118, 133 (App. Div 2018). We review a trial court's discovery rulings for abuse of discretion. <u>Pomerantz Paper Corp. v. New Cmty. Corp.</u>, 207 N.J. 344, 371 (2011). An abuse of discretion "arises when a decision [was]

'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. I.N.S., 779 F.2d 1260, 1265 (7th Cir. 1985)). That said, "appellate courts are not to intervene . . . absent an abuse of discretion or a judge's misunderstanding or misapplication of the law." Cap. Health Sys., Inc. v. Horizon Healthcare Servs., Inc., 230 N.J. 73, 79-80 (2017) (citing Pomerantz, 207 N.J. at 371).

Motions to extend discovery after trial has been scheduled are governed by the "exceptional circumstances" standard. "[T]he 'exceptional circumstances' standard . . . applies when the court has fixed an arbitration or trial date" after discovery has closed. Tynes v. St. Peter's Univ. Med. Ctr., 408 N.J. Super. 159, 169 (App. Div. 2009); accord R. 4:24-1(c) ("No extension of the discovery period may be permitted after an arbitration or trial date is fixed, unless exceptional circumstances are shown.").

Under the "exceptional circumstances" standard, a movant must "satisfy four inquiries" to warrant relief by demonstrating:

> (1) why discovery has not been completed within time and counsel's diligence in pursuing discovery during that time; (2) the additional discovery or disclosure sought is essential; (3) an explanation for counsel's failure to request an extension of the time for discovery within the original time period; and (4) the

34

> circumstances presented were clearly beyond the control of the attorney and litigant seeking the extension of time.
>
> [Rivers v. LSC P'ship, 378 N.J. Super. 68, 79 (App. Div. 2005).]

Applying these principles, we discern no abuse of discretion in the judge's denial of plaintiff's motion to extend discovery to retain an expert. To support its contention that exceptional circumstances justified the extension, plaintiff points to the "abrupt retirement of its expert" and medical issues experienced by plaintiff's counsel, counsel's family, and those in counsel's office. However, plaintiff never identified an expert until the judge granted the summary judgment motion on January 20, 2023, a year after the DED, and never filed its motion for an extension of discovery until over a year past the DED.[10] Under these circumstances, plaintiff cannot demonstrate that it acted diligently or that the judge abused his discretion in declining to reopen discovery to allow plaintiff to serve a yet-to-be-obtained expert report after summary judgment dismissal of the claims had already been granted.

---

[10] Defendants' point that plaintiff should have cross-moved to extend discovery in response to their summary judgment motion or raised the issue purportedly encountered by its expert while the summary judgment motion was pending, instead of waiting until well after the claims were dismissed with prejudice, is well taken.

Although we are sympathetic to the medical issues encountered by plaintiff's counsel, his family, and his staff, there is no evidence in the record on appeal that counsel brought these issues to the judge's attention in relation to counsel's ability to obtain an expert report or that the medical issues factored into the non-procurement of an expert report. See Zaman v. Felton, 219 N.J. 199, 226-27 (2014) (declining to consider arguments not raised before the trial court when an opportunity to do so is available unless the questions "go to the jurisdiction of the trial court or concern matters of great public interest." (quoting State v. Robinson, 200 N.J. 1, 20 (2009))).

As the judge explained, plaintiff refrained from even securing an expert until the judge's ruling made it clear that an expert was required to advance plaintiff's claims. Under the circumstances, plaintiff simply waited too long and failed to demonstrate exceptional circumstances. See Quail, 455 N.J. Super. at 125, 135-36 (affirming the trial court's orders granting summary judgment dismissal of the plaintiff's wrongful death claim and survival action and denying the plaintiff's request to reopen discovery because no exceptional circumstances existed where the plaintiff had made a "conscious, strategic decision" to rely on a death certificate to prove causation rathe

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2134-22